# STATE v. CHICAGO & NORTHWESTERN RAILWAY COMPANY AND ANOTHER.[1]

June 30, 1916.

Nos 19,868—(8).

**Corporation — no merger resulting from ownership of stock of another corporation.**

1 The ownership by one corporation of a majority of the stock of another, does not give the former ownership of or a legal interest in the property of the latter, nor merge the two, nor destroy the legal identity or individuality of either.

**Railway — continuous line formed by two companies — no joint rate under Cashman law.**

2. A railroad corporation owned a majority of the stock of another railroad. Its stockholders owned nearly all of the remainder. So far as concerned the ultimate power of direction and control, the officers of the

[1] Reported in 158 N. W. 627.

two companies were substantially the same. The two roads connected and were operated as a continuous line. Their location was such that they were not competing lines. Each maintained a separate organization and its legal individuality. As respect shipments made over the two, there was a single control and operation ultimately exercised by their common officers. It is *held* that for the purpose of establishing freight rates the two constituted one road or line and that the intrastate, continuous mileage rates fixed by the Railroad and Warehouse Commission pursuant to the distance tariff law (Laws 1913, c. 90), applied, and that the commission was without authority to fix a joint rate under Laws 1913, c. 344.

From an order of the railroad and warehouse commission of the state of Minnesota adopting rules for fixing percentage relations to govern in making joint freight rates, under Laws 1913, p. 486, c. 344, James Hall, a shipper, appealed to the district court for Lyon county. Thereafter the court allowed Atlas Elevator Company and G. W. Van Dusen & Company to come into the case as interveners. The appeal was heard before Olsen, J., who made findings and reversed the order of the commission insofar as it fixed a basis for joint rates between the Chicago & Northwestern Railway Company and the Chicago, St. Paul, Minneapolis & Omaha Railway Company and their lines in Minnesota. From the judgment entered pursuant to the order for judgment, the Chicago & Northwestern Railway Company and the Chicago, St. Paul, Minneapolis & Omaha Railway Company appealed. Affirmed.

*C. C. Wright* and *James B. Sheean,* for appellants.

*Lyndon A. Smith,* Attorney General, *Louis Headley,* Special Assistant to Attorney General, *James H. Hale* and *Lancaster, Simpson & Purdy,* for respondent.

DIBELL, C.

On July 27, 1914, the Minnesota Railroad and Warehouse Commission entered its order, fixing the basis of joint freight rates on railroads within the state. On appeal to the district court of Lyon county by a shipper judgment was entered on March 14, 1916, setting aside the order insofar as it fixed a joint rate for and between the Chicago & Northwestern Railway Company and the Chicago, St. Paul, Minneapolis & Omaha Railway Company. These two companies appeal from the judgment.

On December 10, 1913, the Railroad and Warehouse Commission, pursuant to the distance tariff law (Laws 1913, p. 76, c. 90), established maximum distance intrastate rates for railroads within the state. Rep. R. & W. Com. 1914, p. 18. These rates are substantially those fixed by Laws 1907, p. 313, c. 232, and sustained in Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. On July 27, 1914, the Commission established joint through intrastate rates pursuant to Laws 1913, p. 486, c. 344. Rep. R. & W. Com. 1914, pp. 39-45. The joint rates for certain commodity schedules covering live stock and coarse grains on the Northwestern and the Omaha were established "on the basis of an arbitrary of one cent over the continuous mileage rate established by the commission for class A railroads in its order dated December 10, 1913." The joint rate on other classes and schedules was, in general, based on a per cent of the sum of the locals. It is the contention of the state that the Northwestern road and the Omaha road constitute a single line or road for rate making purposes and that the order of the commission establishing a joint rate is without authority or jurisdiction. The question of reasonableness is not before us. The attack is upon the power of the commission to establish a joint rate.

The trial court found that the line of road owned by the Northwestern company and that owned by the Omaha company constituted one road for the freight passing over them and for purposes of rate making and that the Railroad and Warehouse Commission was without jurisdiction to establish a joint rate. This is the question.

1. The Northwestern owns a majority of the stock of the Omaha. Such ownership does not give it ownership of or a legal interest in the Omaha road, nor does it affect the separate legal identity of the two corporations. Ulmer v. Lime Rock R. Co. 98 Me. 579, 57 Atl. 1001, 66 L.R.A. 387; Monongahela Bridge Co. v. Pittsburg & Birmingham Traction Co. 196 Pa. St. 25, 46 Atl. 99, 79 Am. St. 685; Senior v. New York City Ry. Co. 111 N. Y. App. Div. 39, 97 N. Y. Supp. 645; United States v. Delaware & H. Co. 213 U. S. 366, 29 Sup. Ct. 527, 53 L. ed. 836; United States v. Delaware, L. & W. R. Co. 238 U. S. 516, 35 Sup. Ct. 873, 59 L. ed. 1438; Richmond & I. Const. Co. v. Richmond, N. I. & B. R. Co. 68 Fed. 105, 15 C. C. A. 289, 34 L.R.A. 625; In re Watertown Paper Co. 169 Fed. 252,

94 C. C. A. 528. Each company maintains a separate legal existence and a legal individuality. This is a statement of the legal effect. Control follows majority ownership of stock. Majority ownership may be important in determining whether two roads, from the viewpoint of the distance tariff act and the joint rate statute, and looking beyond the form to the reality of things, are one line or separate roads. We dispose of the naked legal question by the simple statement that the ownership by one corporation of a majority of the stock of another does not pass to the former ownership of or a legal interest in the property of the latter, nor merge the two, nor destroy the identity of either.

2. The Northwestern was organized in 1859; the Omaha in 1880. In 1882 William K. Vanderbilt, acting for the Northwestern, purchased a majority of the stock of the Omaha. In 1883 his act was ratified and the stock was taken over by the Northwestern. The resolution approving the purchase recited that it was essential to the welfare of the company that more stable and permanent arrangements be made for connection with the Northern Pacific and Canadian Pacific lines and for the traffic of Minneapolis and St. Paul and for the use of the various lines of the Omaha, and that "it was found practicable to secure the control * * * by the purchase of a majority of the common and preferred stocks of said company," and that the amount purchased was "sufficient to secure the control." Upon the purchase of the Omaha stock there was a reorganization of the company and the Northwestern officers and directors became the officers and directors of the Omaha. For practical purposes, and so far as concerns the ultimate power of control and direction, the two companies are officered in common. The Northwestern now owns fifty and a fraction per cent of the stock of the Omaha. Eighty-five per cent of the remainder is owned by Northwestern stockholders.

The state does not claim, as we understand its position, that the mere ownership of a majority of the Omaha stock makes the two roads one. It does claim that the two roads as controlled and operated are one continuous road or line for rate making purposes, and that a majority ownership in one of the stock of the other is important in determining whether there is a unity of operation of the two properties under a single and undivided control.

The Northwestern has terminals at Chicago and Milwaukee and lines

there.   It has no lines to Omaha, or to St. Paul and Minneapolis, or to Duluth and Superior.   The Omaha has terminals at Omaha, St. Paul and Minneapolis, and Duluth and Superior, and lines there.   It has no lines to Chicago or Milwaukee.   The Northwestern meets the necessity of reaching the northwest and competing for its traffic through the Omaha. The Omaha meets the necessity of an outlet to Chicago and Milwaukee through the Northwestern.   They connect but do not compete.   Except at a few points where they touch common territory, and where possible competition is negligible, their physical location does not permit competition.   They are advantageously located for joint operation as a continuous single line.

The physical operation of each is in a way distinct.   The Northwestern engines do not run over the Omaha line nor the Omaha engines over the Northwestern line.   The employees of one company are not employees of the other.   The employees of one do not work on the line of the other. Each company maintains its own roadbed, provides its own rolling stock, and pays its own employees.   Such facts are indicative of separate ownership and operation.   The state refers to others tending to show a unity of operation as one line.   They are evidentiary in character.   Sometimes they are in dispute or their apparent effect is explained or minimized. The inferences to be drawn from them and their probative force were for the court.   Through freight and passenger trains originating on one road pass over the other to their final destination.   Freight in less than carload lots going from one to the other is handled as if over one road. Freight passes from one over the other without the usual traffic contracts. The car distribution differs from that usual between separate roads.   The cars of the two companies are "system" cars and not "foreign" as are the cars of other roads.   Less effort is used to keep the cars of one company off the line of the other than off the lines of foreign roads, and the "system" cars pass more freely from one road to the other.   The Northwestern has loaned the Omaha money in time of need, and has built tracks or branches which touch only the Omaha.   The two companies advertise and solicit freight and passengers as a single line.   The designation "Chicago and Northwestern Line" applies to both and to each. Throughout, their cars are of the same type and appearance.   Freight receipts to be divided between the two roads and foreign roads are divided

upon the basis of continuous mileage considering the two roads as one. Routing directions are given upon the basis that the two roads are one. In Superior Commercial Club v. Great Northern Ry. Co. 24 Interstate C. C. 96, there were involved grain rates from points in North and South Dakota and Minnesota to Minneapolis, Duluth and Superior, and Milwaukee. Many railroads were parties. In referring to the Northwestern and the Omaha the commission said: "The Northwestern and the Omaha, while operated as separate companies, are under a substantially common ownership and control. They have several main lines running east and west and north and south in South Dakota, Iowa, southern Minnesota, and northern Nebraska. They have their own lines to Minneapolis, Duluth-Superior, Omaha, Chicago and Milwaukee. The Northwestern line extends a short distance into North Dakota, reaching a competitive point with the Northern Pacific at Oakes. It meets the competitive rates from Oakes fixed by the Northern Pacific and carries that Duluth rate through Mankato to Duluth." And having in mind that the Northwestern and Omaha as one line meet competition with the Northern Pacific and Great Northern having direct lines of shorter mileage, the commission made this finding: "Distances are to be measured by the short line of the originating system having lines to Duluth-Superior and to Milwaukee or Chicago, the Northwestern and Omaha being considered as one system * * *." It may be conceded that the two companies consented to be treated as constituting one line. The fact of significance is that they were so considered by the commission and that they so regarded themselves. It was upon this basis that they voluntarily met the Northern Pacific competition at Oakes.

The purpose of majority ownership of corporate stock is corporate control. This is its legitimate effect, and under the form of lawful control there may arise legal consequences not unlike those arising from single ownership. Thus in Pearsall v. Great Northern Ry. Co. 161 U. S. 646, 16 Sup. Ct. 705, 40 L. ed. 838, an arrangement whereby one railroad was to acquire one-half of the capital stock of a competing and parallel line was held in violation of the Minnesota statute forbidding the consolidation with, purchase or lease of parallel or competing lines. The court said: "With half of its capital stock already in its hands, the purchase of enough to make a majority would follow almost as a matter

of course, and the mastership * * * would be assured." And in Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. ed. 679, affirming 120 Fed. 721, there was held to be a violation of the Federal anti-trust statute through a restraint of trade and commerce, brought about by the control of two corporations by means of a majority stock ownership in a holding company, though each continued its legal individuality. In the circuit court opinion Judge Thayer referred to the result of majority stock ownership as follows: "It will not do to say that, so long as each railroad company has its own board of directors, they operate independently, and are not controlled by the owner of the majority of their stock. It is the common experience of mankind that the acts of corporations are dictated and that their policy is controlled by those who own the majority of their stock. Indeed, one of the favorite methods in these days, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. * * * And, so long as directors are chosen by stockholders, the latter will necessarily dominate the former, and in a real sense determine all important corporate acts." In this conection Southern Pac. Ter. Co. v. Interstate Com. Com. 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310, is cited, not because of a similarity of facts, but as an illustration of a unity of control and operation of properties of different corporations through a holding company, though each company maintained its legal identity, the court looking through the form to the reality. The court said: "Another and important fact is the control of the properties * * * through stock ownership. There is a separation of the companies if we regard only their charters; there is a union of them if we regard their control and operation. * * * This control and operation are important facts to shippers. * * * Verbal declarations cannot alter the facts. The control and operation * * * have united them into a system of which all are necessary parts." And further: "In opposition to these views appellants urge the legal individuality of the different railroads and the terminal company, and cite cases which establish, it is contended, that stock ownership simply or through a holding company does not identify them. We are not concerned to combat the proposition. The record does not present a case of stock ownership merely, or of a holding company which was content to hold. It presents a case, as we have already said of

one actively managing and uniting the railroads and the terminal company into an organized system. And it is with the system that the law must deal, not with its elements. Such elements may, indeed, be regarded from some standpoints as legal entities; may have, in a sense, separate corporate operation; but they are directed by the same paramount and combining power and made single by it. In all transactions it is treated as single." United States v. Delaware, L. & W. R. Co. 238 U. S. 516, 35 Sup. Ct. 873, 59 L. ed. 1438, involving the commodity clause of the Hepburn Act, is another case where unity of management and not stock ownership was made the test of illegality under a statute forbidding a carrier to transport any commodity manufactured, produced or owned by it.

It was the fixed purpose of the Northwestern, when Vanderbilt with the concurrence of its president arranged for the acquisition of a majority of the Omaha stock, to bring the two roads under one control and operation. It meditated no wrong and did none. Business sagacity prompted the purchase and no public policy was offended. It was beneficial to the companies and to the public. The present operation is not the result of a co-operation of two distinct companies having separate interests. The directing control of the two roads is one and single. There is a single and paramount control and domination of both properties and a unity of operation as a continuous line. Whatever the form this is the reality.

Chapter 90, p. 76, Laws 1913, the distance tariff statute, and chapter 344, p. 486, Laws 1913, the joint rate statute, are not to be so narrowly construed that once it is shown that a line of singly operated railroad is owned by two legal entities, regardless of the singleness of control and operation, the distance tariff law is inapplicable and the joint rate statute applicable. Our conclusion is that the finding of the trial court is sustained, and that the distance tariff law is applicable and that there was no authority for establishing a joint rate.

Judgment affirmed.