# MINNEAPOLIS CIVIC & COMMERCE ASSOCIATION v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY AND OTHERS.[1]

## July 21, 1916.

## Nos. 19,878—(10).

**Railway — terminal road — finding sustained by evidence.**

1. Both the Railroad and Warehouse Commission and the trial court found as a fact that the Minneapolis Eastern Railway is one of the terminal facilities of the "Milwaukee" and "Omaha" railway systems at Minneapolis. *Held*, that the fact that these companies furnished all the funds for constructing the "Eastern" and own all its capital stock and bonds, taken in connection with the restrictions imposed upon it by the contract under which it was constructed and the rights and powers secured to these companies by such contract and with the facts disclosed as to the manner in which it is managed, controlled and operated, is sufficient to sustain such finding.

**Railway — discrimination — switching charges.**

2. Imposing charges for switching shipments of grain to industries located upon the tracks of the "Eastern," no charge being made for switching like shipments to industries located upon other industrial tracks of the "Milwaukee" and "Omaha," is an unjust discrimination against the industries served by the tracks of the "Eastern."

**Same.**

3. The charges for the line haul made by the "Milwaukee" and "Omaha" include the charge for switching to and from industries located upon their industrial tracks, and they cannot remove the discrimination against industries located upon the tracks of the "Eastern"

---

[1] Reported in 158 N. W. 817.

Note.—As to right of carrier at common law to discriminate between shippers, see note in 18 L.R.A. 105.

by imposing an additional charge for switching over their other industrial tracks.

The Minneapolis Civic and Commerce Association petitioned the Railroad and Warehouse Commission of Minnesota to investigate the ownership of the stock of the Minneapolis Eastern Railway Company, and direct that all line traffic transported by the Chicago, Milwaukee & St. Paul Railway Company and the Chicago, St. Paul, Minneapolis & Omaha Railway Company should be handled without the interposition of a so-called switching charge; that defendants be required to treat this switching line as a part of their own terminals in Minneapolis and that they be required to publish and maintain switching tariffs applicable to local or industrial traffic to apply to and from all industries served by that company without assessment of separate or additional charge therefor.  The matter was heard by the commission who made findings that the Minneapolis Eastern Railway Company was a part of the terminal property of the other two railway companies and ordered that defendant companies and the Minneapolis Eastern Railway Company cease to charge for carload shipments of freight moving to the roads of the other defendants or from mills or elevators upon the tracks operated by the Minneapolis Eastern Railway Company.  From that order defendant companies appealed to the district court for Hennepin county, where the appeal was heard before Leary, J., who made findings and affirmed the order of the commission.  From the judgment entered pursuant to the order for judgment, defendants appealed.  Affirmed.

*F. W. Root, W. H. Norris, J. B. Sheean* and *George W. Paterson,* for appellants.

*Lyndon A. Smith,* Attorney General, and *Frank J. Morley,* for respondents.

TAYLOR, C.

The Chicago, St. Paul, Minneapolis & Omaha Railway Company, designated in these proceedings as the "Omaha", and the Chicago, Milwaukee & St. Paul Railway Company, designated in these proceedings as the "Milwaukee," are Wisconsin corporations; and each operates an extensive railway system having important and extensive terminals in

the city of Minneapolis. The Minneapolis Eastern Railway Company, designated herein as the "Eastern", is a Minnesota corporation and operates 2.63 miles of track as a switching railroad which serves several of the large flour mills in the city of Minneapolis. This company was organized in 1878 by the millers of Minneapolis, but, at the time of its organization or shortly thereafter, an arrangement was made by which the Omaha and Milwaukee companies, in equal amounts, provided the funds for constructing and equipping the road and took over the capital stock and bonds thereof. The Eastern charges and collects $1.50 per car for all inbound shipments handled by it, and 10 cents per ton, with a minimum charge of $1.50 per car, for all outbound shipments handled by it; but neither the Milwaukee nor the Omaha make any charge for the terminal switching done by themselves where they have the "line haul."

Plaintiff filed a complaint with the Railroad and Warehouse Commission, alleging that the Eastern is merely a part of the terminal facilities of the Milwaukee and Omaha companies, and that the charge for delivering shipments to industries situated upon the tracks of that company was an unlawful discrimination against such industries. After a hearing the Railroad and Warehouse Commission found the facts to be as claimed by plaintiff and made an order that the Milwaukee, the Omaha and the Eastern companies, and each of them, "cease and desist from charging $1.50 per car for handling inbound shipments over the lines of the Chicago, St. Paul, Minneapolis & Omaha Railway Company and Chicago, Milwaukee & St. Paul Railway Company and each of them, which are to be delivered by the Minneapolis Eastern Company to mills or elevators located upon the tracks now operated by the same, or delivered by said company to connecting carriers, and that said Minneapolis Eastern Railway Company cease and desist from charging $1.50 per car or any other sum for delivering carload shipments of freight moving from connecting carriers to the Chicago, St. Paul, Minneapolis & Omaha Railway Company or Chicago, Milwaukee & St. Paul Railway Company, or each of them, or from mills and elevators located upon the tracks now operated by said Minneapolis Eastern Railway Company to the said Chicago, St. Paul, Minneapolis & Omaha Railway Company and Chicago, Milwaukee & St. Paul Railway Company, or each of them, and that said Chicago, St. Paul, Minneapolis & Omaha Railway Company

and Chicago, Milwaukee & St. Paul Railway Company, and each of them, be, and the same are hereby required to operate said main track, yard track and sidings as a part of the terminal property of each of said railroads within the city of Minneapolis. This order shall apply only on intrastate shipments of freight, and shall take effect on the first day of February, A. D. 1915."

The companies appealed from this order. The district court tried the cause anew, and made findings and rendered judgment substantially the same as the findings and order made by the commission. The companies appealed therefrom to this court.

The Milwaukee and Omaha companies and, so far as disclosed, all other railways entering Minneapolis deliver and accept freight, shipped over their respective lines, at any industry reached by their own rails without making any charge for switching to or from such industry. The expense for such service is covered by the charge for the "line haul." Both the Milwaukee and the Omaha "absorb" the charges of the Eastern for switching and delivering inbound shipments of commodities other than grain, and outbound shipments of all kinds in all cases where they receive $15 or more per car for the line haul; but charge and collect $1.50 per car, in addition to the charge for the line haul, for all inbound shipments of grain switched and delivered by the Eastern. In other words, it costs $1.50 more per car to deliver grain to an elevator or mill located upon the Eastern than to an elevator or mill located upon any industrial track of either company, regardless of the distance the shipment is transported in the switching operation. If the Eastern is merely a terminal facility of these companies,—in other words, one of their industrial tracks—this charge operates as a discrimination against the mills and elevators located upon that line. Officers of the companies testified that they made deliveries without charge for switching to all industries reached by their own rails, and would have made deliveries without charge to all industries reached by the Eastern if they had owned the tracks of that company. Consequently the pivotal question is whether the finding of both the commission and the trial court that the Eastern in fact constitutes a part of the terminal facilities of the Milwaukee and the Omaha and is operated as such is sustained by the evidence.

The companies contend that the Eastern is a separate legal entity which transacts its own business and operates its own line wholly independent of the Milwaukee and Omaha; that the fact that these two companies own all its capital stock places them in no different position from that of any other stockholder; and that services rendered by the Eastern should be treated as services rendered by a company entirely separate and distinct from the holding companies.

The situation and effect resulting from the ownership by one railway company of the capital stock of another was explained in State v. Chicago & Northwestern Ry. Co. 133 Minn. 413, 158 N. W. 627, sufficiently to make further explanation thereof unnecessary herein.

The Eastern was incorporated in June, 1878. The articles of incorporation fixed the capital stock at 10,000 shares, provided for a board of nine directors, and named the nine who constituted the first board. On October 25, 1878, and before it possessed any funds or had begun the construction of its road, the Eastern as party of the first part, the Milwaukee as party of the second part, and the company which, so far as here material, is now the Omaha as party of the third part, entered into a contract which, among other things, provided that only 300 shares of the capital stock of the Eastern should be issued during the continuance of the contract, of which 145 shares were to be issued to a trustee, one share to each of five directors of the company residing at Minneapolis and their successors in office, 75 shares to the Milwaukee or to persons designated by that company, and 75 shares to the Omaha or to persons designated by that company; that the 145 shares issued to the trustee and the five shares issued to the directors should not be transferrable, except by the written consent of all three companies, and that any transfer thereof without such consent should be void; that "on or before the first day of December next the board of directors of the said party of the first part shall cause two persons to be named by the party of the second part and two persons to be named by the party of the third part, to be elected into said board, as directors, and shall cause the necessary vacancies to be made in the said board for that purpose;" that the Eastern should forthwith locate the line of its railroad as therein specified, procure the right of way therefor, and commence and complete the construction thereof as soon as possible; and that the East-

ern should issue its bonds in the sum of $150,000 secured by a trust deed of its property. This contract also contained these further provisions which we quote in full: "In consideration of the premises the said parties of the second and third parts agree to purchase as many of said bonds at the rate of eighty per cent of their par value as may be necessary to furnish a fund sufficient to pay for the right of way, construct and complete said railway within the termini above mentioned and to equip the same ready for business, each of the said second and third parties taking and paying for an equal amount thereof to be paid for from time to time as required by the party of the first part to pay for said right of way and the construction and equipment of said railway.

"It is mutually agreed that said second and third parties are to have equal and the same rights in and to the said railway of the party of the first part in all respects, that they are to pay the same price for switching and handling their respective cars on said railway and that no partiality or favor is to be shown or extended to one of the said parties over the other and that the business of each is to be transacted with equal promptness and dispatch, and it is further agreed that the superintendent, or person having charge of the operation thereof shall be appointed by the consent and mutual agreement of all the parties to these presents.

"The said party of the first part shall charge all persons and parties for switching loaded cars either in or out over said track, the sum of one dollar for each loaded car. But in consideration that the parties of the second and third part shall have advanced the money necessary to build and complete said railway a rebate of fifty per cent of said charge shall be made to each of said second and third parties on their business on said railway.

"In case any other railroad company having equal facilities of access to the mills at Minneapolis with the railway of the party of the first part shall promptly and satisfactorily do the switching for said second and third parties hereto, to said mills over its said railroad, then and in that case the said party of the first part with the written consent of the said second and third parties, will do switching for such railroad company over the said railway of the party of the first part on the same terms that switching for the said second and third parties is done over such other railroad, but in such case the price for switching to be charged

and collected by said party of the first part shall be uniform as to all and without rebate to any person or company."

The road was constructed, equipped and put into operation under and pursuant to this contract. By a subsequent arrangement the Milwaukee and Omaha companies became the owners of all the capital stock issued by the Eastern, each owning one-half thereof. Although each of the nine directors holds one qualifying share, such shares in fact belong to one or the other of these companies. Four of the directors are officers of the Omaha; three of the others are officers of the Milwaukee; another is the attorney of the Eastern and was formerly an attorney of the Milwaukee; the other, a banker of Minneapolis, is president of the Eastern, and was intended as a sort of umpire between the Omaha and the Milwaukee interests and is not affiliated with either of these companies. The duties of the board of directors appear to be little more than nominal, however, for by a by-law "the management and control of all operations of the company" is placed in the hands of a managing committee of two members elected by the directors. For many years the general superintendent of the Milwaukee and the general manager of the Omaha have constituted this managing committee, and have controlled, managed and operated the Eastern without interference by either the Milwaukee, the Omaha, or its own board of directors. Neither the president nor the directors receive any compensation. The members of the managing committee receive no compensation from the Eastern, and no additional compensation from their own companies for services performed for the Eastern. Under and subject to the managing committee is a superintendent who hires and discharges employees and has active charge of the operation of the road. The company has its own tracks and equipment which it operates by its own employees, and it serves all the nine railroads entering Minneapolis upon the same terms. Its tracks connect with those of the Milwaukee, of the Great Northern, and of the Railway Transfer. Railways having no direct connection with it make connection over one or the other of those lines. It neither issues nor receives waybills, but transfers cars to and from the various industries on its lines upon switching cards. It collects its charges for switching from the railway delivering or receiving the shipment, except in the few cases where cars are transferred from one industry to another, or some like service

is performed. It files its tariffs with the Interstate Commerce Commission and with the State Railroad and Warehouse Commission, makes the customary reports to both these commissions, and pays a gross earnings tax to the state and a corporation tax to the United States. It makes its own contracts, collects its own revenues and pays its own bills. Its charges, considered by themselves independent of the line haul, are found and are conceded to be reasonable for the service rendered.

Plaintiff contends that the Milwaukee and Omaha companies control the management and operation of the Eastern, not only through the ownership of its stock, but by means of the rights and powers secured to them by the contract under which its railroad was constructed and has since been operated, and that they in fact operate it as one of their industrial tracks. By this contract these companies obligated the Eastern to issue no more than 300 of its 10,000 shares of capital stock; to make no disposition of 150 of such 300 shares without the consent of both of them; to elect as directors two persons named by the Milwaukee and two persons named by the Omaha; to locate and construct its road along the route and between the terminals therein specified; to issue its bonds in the sum of $150,000 secured by a mortgage on all its property, which bonds the companies were to purchase at eighty per cent of their par value; to give these companies "equal and the same rights in and to the said railway;" to put a person mutually agreed upon by the three companies in charge of the operation of the road; to charge a specified rate for switching; and to give these companies a rebate of fifty per cent of the prescribed charge. The contract further provided that in case any other railroad should have facilities for switching to the mills equal to those of the Eastern, and should promptly and satisfactorily do such switching for the Milwaukee and Omaha, then and in that event the Eastern, with the written consent of the Milwaukee and Omaha, should do switching for such other company on the same terms that such other company did switching for the Milwaukee and Omaha; and that in such case the charges of the Eastern should "be uniform as to all and without rebate to any person or company."

The rates for switching prescribed in the contract have since been advanced and the provision for rebates is no longer effective, but the contract clothed the trunk lines with rights and powers much more ex-

tensive than those usually possessed by a mere owner of capital stock. By prohibiting the Eastern from issuing more than 300 of its 10,000 shares of capital stock, and by providing for the issuance by it and the purchase by themselves of a prescribed amount of bonds secured by a mortgage upon all its property, the trunk lines seriously curtailed the power of the Eastern to finance its undertaking in any other manner than through themselves.    Financial dependence would be a natural result of such arrangement, and in fact the Eastern has received no funds, other than its earnings, from any other source.    The trunk lines also stipulated that each should have an equal voice with the Eastern in selecting the person who should take charge of and operate its road. For some years the general manager of one and the general superintendent of the other, acting together, have had the full and exclusive control and management of the business and affairs of the Eastern, and have operated it through a superintendent selected by themselves and subject to their orders.    The contract also fixed the charges to be made by the    Eastern and thereby gave the trunk lines power to control any changes in such charges except as such power has been limited by statute.    The provision specifying the conditions under which the Eastern should do switching for other railways whose rails reached the mills implies that it was to perform such services only when authorized by the trunk lines, and that the trunk lines expected to control its action in that respect and to use it as a means of making satisfactory arrangements with such other railways.    Although statutes enacted since the making of the contract may have deprived this provision of much of its potency, it tends to show that the parties contemplated that the Eastern should be used as an instrumentality for furthering the interests of the trunk lines.

While the ownership of the capital stock would not be sufficient in and of itself to support the findings of the trial court, we think that fact coupled with the other facts disclosed by the record are sufficient to sustain such findings.    Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310.    As said in the case cited: "The record does not present a case of stock ownership merely or of a holding company which was content to hold," but a case where the power to control the operation of another company has

134 M.—12.

been secured and is being exercised. The trunk lines already "absorb" the charges of the Eastern for handling outbound shipments in all cases where no charge would be made for handling such shipments if handled upon other industrial tracks belonging to them, and also "absorb" the charges of the Eastern for handling inbound shipments of all commodities other than grain where no charge would be made for handling such shipments if handled upon such other industrial tracks; and the practical effect of the order is to require them to extend their "absorption" so as also to take in the charges of the Eastern for handling shipments of inbound grain.

The companies contend that, if the Eastern be held to be one of the terminal facilities of the trunk lines, and if charging for delivering grain thereover without charging for making such deliveries over their other industrial tracks is an unlawful discrimination, they have a right at their option to remove such discrimination either by abolishing the charges for deliveries over the Eastern or by collecting like charges for deliveries over such other tracks; and that the court erred in not according them such option. This position is untenable. The charges for the services rendered by means of the terminal facilities of the trunk lines are embodied in and covered by the charges for the line haul, and are provided for by the tariffs of the respective companies. Interstate Commerce Commission v. A. T. & S. F. Ry. Co. 234 U. S. 294, 34 Sup. Ct. 814, 58 L. ed. 1319. The case of Great Northern Ry. Co. v. State, 238 U. S. 340, 35 Sup. Ct. 753, 59 L. ed. 1337, did not involve these questions and is not in point.

Judgment affirmed.