## STATE EX REL. LYNDON A. SMITH v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.[1]

December 21, 1917.

No. 20,542.

**Carrier — effect of through traffic agreement.**

   1. The legal effect of a through traffic agreement between two or more railroad companies owning and operating connecting lines of road is the creation of a new and independent continuous line.

**Same — continuous through line.**

   2. The contract set out in the opinion brings this case within the rule and with respect to the traffic there agreed upon creates a continuous through line under the control of appellant, between the points therein stated.

**Same — distance tariff act — order of railroad commission.**

   3. Chapter 90, Laws 1913, the distance tariff act of that year, and a tariff order made thereunder by the Railroad and Warehouse Commission, apply to traffic carried on under such contract.

**Same — interstate commerce — Constitution.**

   4. The judgment of the court below so declaring and requiring a compliance with the order as respects shipping points within the state, is not an interference with interstate commerce and violates none of the constitutional rights of appellant.

[1]Reported in 165 N. W. 869.

Upon the relation of Lyndon A. Smith, attorney general, the district court for Ramsey county granted its alternative writ of mandamus commanding Chicago, Milwaukee & St. Paul Railway Company to put into effect the distance tariff promulgated by the Railroad and Warehouse Commission on December 10, 1913, pursuant to Laws 1913, p. 76, c. 90. The matter was tried before Dickson, J., who granted a peremptory writ. From the judgment entered pursuant to the order for judgment, respondent appealed. Affirmed.

*F. W. Root, N. J. Wilcox, O. W. Dynes* and *Burton Hanson,* for appellant.

*Lyndon A. Smith,* Attorney General, and *James E. Markham,* Assistant Attorney General, for respondent.

BROWN, C. J.

The state Railroad and Warehouse Commission on December 10, 1913, acting under and pursuant to the provisions of chapter 90, p. 76, of the Laws of 1913, duly made and promulgated a general distance tariff order applicable to all railroad corporations and common carriers operating within the state, and thereby prescribed certain maximum rates for all freight and commodity shipments stated therein. The order on its face was made applicable to appellant, Chicago, Milwaukee & St. Paul Railway Company. But the company insisted that it did not apply to that part of its transportation business which extends partly over the line of the Northern Pacific Railway Company to Duluth, and other points on Lake Superior, included within the designation of "Head of the Lakes," namely, Carlton, Cloquet and Duluth, Minnesota, and Superior, Wisconsin, all reached by the Northern Pacific line, and for that reason refused to put the order in force or apply it to that traffic. The attorney general, on behalf of the state, then brought this proceeding in mandamus to compel obedience to the order as applied to shipments within the state. The appellant answered, therein setting up in defense its claim of the inapplicability of the order to the traffic over the two lines of road, and interposed also the contract between the railroad companies under which it was carried on and conducted, from which it contended that the tariff rates were controlled by chapter 344, p. 486, of the Laws

of 1913, the Joint Traffic Act, and not by chapter 90, p. 76, Laws 1913, under which the disputed order was made.

At the conclusion of the trial below the court found the facts in harmony with the allegations of the petition and alternative writ, and further, that since October 1, 1900, appellant "has been and now is a common carrier of freight in intrastate commerce between points on its lines" in Minnesota, other than St. Paul and Minneapolis, and points at the Head of the Lakes reached by the Northern Pacific Company. Judgment was ordered and entered as demanded by relator and appellant appealed.

The facts are not in any material respect disputed and so far as necessary to an understanding of the questions involved are substantially as follows:

The appellant, Chicago, Milwaukee & St. Paul Railway Company, is a Wisconsin corporation and owns and operates a line of railroad extending from Chicago, in the state of Illinois, into and through this state, and between numerous shipping points therein, including St. Paul and Minneapolis. It has no constructed line to Duluth, this state, or to other points within the zone known as the Head of the Lakes, The company since the year 1900 has been conducting and carrying on a through transportation business, as a common carrier, from points on its line within and without the state, in part over its own line and in part over the line of the Northern Pacific Company, as it extends from St. Paul and Minneapolis to the Head of the Lakes; and as to shipments arising at that point or points beyond, from thence over the Northern Pacific line to any or all points on its own line, in Minnesota or elsewhere, excepting shipments terminating at St. Paul or Minneapolis. And this is the transportation business the court below held to be within the distance tariff order here involved. It has been so carried on by appellant under and pursuant to the terms and provisions of the contract referred to in its answer herein, the material portions of which are as follows:

"Section 1. The St. Paul Company hereby agrees that it will, so far as it lawfully may, give to the Pacific Company all such freight traffic as it may send or cause to be sent from or to points (other than

St. Paul and Minneapolis) on its lines or its connections to, from or through the 'Head of the Lakes,' and, as the case may be, will deliver to or receive from the Pacific Company all such traffic at St. Paul; it being the intention of the parties hereto, that the St. Paul Company shall do no business—except as it may by law be required to do—to, from or through the 'Head of the Lakes' by any other line than that herein established.

"Section 2. The Pacific Company hereby agrees to transport all the above mentioned traffic over and upon the lines mentioned and referred to in paragraph (a) above, and as the case may be, to receive from or deliver to the St. Paul Company all such traffic at St. Paul; and the St. Paul Company may, at all times during the continuance hereof, fix the through rates on any and all of the aforesaid traffic, and publish its own tariffs therefor; provided, however, that such through rates shall in no case be less than the local rates then charged by the Pacific Company on traffic of a like class between said 'Head of the Lakes' and the cities of St. Paul and Minneapolis; and provided further, that the above mentioned traffic shall not include any business received from or delivered to other carriers in or at St. Paul and Minneapolis; but provided also, that freight billed or destined to points in St. Paul or Minneapolis, the destination of which is changed before the property is removed from cars, shall not be considered as originating at said cities.

"Section 3. It is mutually understood and agreed by and between the Pacific Company and the St. Paul Company, that the through rates aforesaid shall be divided between said companies upon the basis of a pro rate per local rate, after deducting such proportions of such through rates as are due to other lines; and that for the purpose aforesaid, each of said companies shall at once file with the auditor of the other its local tariffs in effect October 1, 1900, and shall likewise, from time to time hereafter, when new tariffs are issued, in any wise affecting this agreement, immediately file, as aforesaid, copies of such tariffs; and said auditors shall prepare a table of divisions which will insure to the Pacific Company and to the St. Paul Company a pro rata per local rate of the revenue derived by them jointly from the business done under this agreement; provided, however, that nothing herein contained shall be construed as authorizing the destruction, before division, of any switching

charges, such charges being declared not to be proportions due to other lines, but an expense to be borne by the St. Paul Company; but provided also, that the Pacific Company shall make no switching or trackage charge against joint traffic for its own services.

"Section 4. It is further mutually understood and agreed by and between said last named companies that, for the purposes of this contract, three (3c) cents per hundred pounds shall be deemed and taken to be the local rate of the Pacific Company between St. Paul and Minneapolis, and the 'Head of the Lakes' on all grain, grain products, flax seed and lumber in car loads, and on coal in car lots, if loaded in box cars, or in open cars under the conditions specified in section 6; and that for the purpose of establishing a basis for division of through rates on coal, the tariffs first established by the St. Paul Company from the 'Head of the Lakes' shall be construed as based upon a local rate of three (3c) cents per hundred pounds to the Pacific Company; the percentage thereby established being used for the division of all future rates and—except as hereinafter otherwise provided—the Pacific Company's proportion of the through rates made by the St. Paul Company upon any of the above enumerated articles shall not at any time be more than three (3c) cents nor less than two (2c) cents per hundred pounds.

"Section 5. It is further mutually understood and agreed by and between the last named companies that on all traffic via the 'Head of the Lakes' in connection with boat lines on Lakes Superior, Huron and Erie, and their rail and canal connections, to or from points (other than St. Paul and Minneapolis) on the lines of the St. Paul Company and its connections, the Pacific Company will not ask, and shall not receive as its proportion of the through rate any greater rate than it at the same time accepts on traffic of the same class between St. Paul and Minneapolis and Lake Superior, Huron and Erie ports, or on traffic via said ports to or from St. Paul or Minneapolis.

"Section 6. The Pacific Company and the St. Paul Company further mutually agree that each of them will furnish (in the usual and customary manner among railroads) its quota of the freight cars necessary to carry on the business contemplated herein; and that if at any time the St. Paul Company shall not have at the 'Head of the Lakes'

sufficient cars to handle the business then tendered to it, and the Pacific Company shall at the same time be unable or unwilling to furnish cars therefor, then the Pacific Company will haul to the 'Head of the Lakes' such empty freight cars as the St. Paul Company may tender to it at St. Paul for the purpose aforesaid.

"Section 7. It is further mutually understood by said last named companies, and the Pacific Company agrees that it will handle all of the freight traffic of the St. Paul Company contemplated in this contract in the same manner in which it handles its own traffic of the like class; and that it will not give to any other railway or transportation company, or to any person or persons, for any traffic carried upon or over the premises embraced in this contract, lower rates or better facilities for substantially similar service than are given to the St. Paul Company; and in case any company or companies, person or persons, shall directly or indirectly receive from the Pacific Company such lower rates or better facilities, then and in such case, and for the time during which such lower rates or better facilities shall prevail, such lower rates shall apply to like business of the St. Paul Company in lieu of the rates provided for, or theretofore charged by the Pacific Company.

"Section 8. The Pacific Company and the St. Paul Company further mutually agree that all traffic covered by this agreement shall be through waybilled, except in cases where the auditors of the said companies shall decide that rewaybilling will be more convenient in keeping joint accounts, and all settlements of joint accounts shall be made in the usual and customary manner on or before the twenty-fifth day of each month for the business of the month next preceding.

"Section 9. It is further mutually understood and agreed by and between the last named companies, that the St. Paul Company may at its own expense establish at the 'Head of the Lakes' such commercial agencies as it deems necessary for the transaction of the business contemplated in this agreement; and that the officers and agents of the Pacific Company will comply with the instructions received from such agencies, or from the general officers of the St. Paul Company, in regard to said business, and will give to such agencies or to said general officers access at all proper times to its station records, so far as the same

may be necessary to enable the St. Paul Company to have full informa-tion regarding the business aforesaid.

"Section 10. Whereas, if the Pacific Company should at any time by law be divested of the right to the possession and use of the whole or any portion of the lines of railroad formerly controlled and operated by the Duluth Company, and mentioned and described in paragraph (a) above, and such possession and use should by law be cast upon the Duluth Company, the performance of this contract to that time will have resulted in great benefit and advantage to the Duluth Company, and the continuance thereof will result in like benefit and advantage to that company, Now, Therefore, it is agreed between the St. Paul Com-pany and the Duluth Company, that if at any time while the provisions of this article I are in force the Pacific Company shall be divested as aforesaid of the possession and use of the whole or any portion of the property formerly belonging to the Duluth Company, and the Duluth Company shall again come into possession and use thereof, then and in such case the Duluth Company shall and will and it does hereby assume and agree to perform all the covenants and agreements hereinabove made by the Pacific Company to and with the St. Paul Company, so that the business contemplated in this article I shall, during the then remaining term hereof, be carried on in all respects as if no such di-vestiture had taken place, and the St. Paul Company's proportion of the above mentioned 'through rates' shall in no wise be changed thereby.

Section 11. * * *

"Section 12. It is mutually agreed that, for the purpose of the inter-change of business provided in this article, as well as for use under article II hereof, if and when that article becomes effective, the Pa-cific Company and the St. Paul Company shall, as soon as may be, construct a connection between the tracks of the St. Paul Company and the tracks formerly belonging to the Duluth Company, in the city of St. Paul, in such manner and at such place as may be agreed upon be-tween the general superintendents of said companies; such connection shall be put in at the joint expense of the two companies, and shall be operated and maintained during the continuance of any article of this agreement at joint expense."

The contract contains other provisions by which certain options are granted to appellant in reference to this line of traffic over the Northern Pacific road which may or may not in the future be acted upon, but they are of no special importance in this controversy and require no further mention. The trial court held that the portion of the contract here set out in legal effect created a single line of transportation, controlled by appellant, to which chapter 90, p. 76, Laws 1913, and the distance tariff order made thereunder, apply, and judgment was ordered accordingly.

It is the contention of appellant, upon the facts stated: (1) That since it neither owns nor operates a line of railroad reaching the Head of the Lakes, chapter 90, p. 76, of the Laws of 1913 has no application to traffic of the kind disclosed, and that the court below erred in construing the distance tariff order in question as applicable thereto; (2) that if the statute and order be held applicable, then the enforcement of the judgment appealed from will deprive appellant of its property without due process of law in violation of rights granted by section 1 of article 14 of the Federal Constitution, and result in the impairment of rights secured and obligations imposed by the contract under which the traffic is conducted, in violation of section 10 of article 1 of that Constitution; and (3) that the judgment requiring a compliance with the order of the commission constitutes an unlawful interference with interstate commerce.

Our conclusion after a full consideration of the questions presented is that none of these contentions can be sustained. We have no difficulty in holding, on the facts stated, that appellant was engaged in the business of a common carrier between the points stated, even though it did not in fact own or operate the line of the Northern Pacific Company between St. Paul and the Head of the Lakes. Under the traffic agreement with that company, as shown by the quotations from the contract, appellant is given full control over all shipments from its line over that of the Northern Pacific; the officers and agents of the latter in respect to that traffic are subject to its orders and directions, and appellant controls the matter of freight charges, within the limits of the law, fixing and publishing through rates over the route thus created. In the face of such facts it would seem clearly to follow that

appellant is as much engaged as a common carrier over the two lines of road, as though it owned and actually operated the Northern Pacific line. It has long been a rule of the Federal courts, and the Interstate Commerce Commission, that where two or more companies owning connecting lines of road, as in the case at bar, unite in a joint through traffic agreement, they form for the connected roads practically a new and independent continuous line. Chicago & N. W. Ry. Co. v. Osborne, 52 Fed. 912, 3 C. C. A. 347. The Through Rates Case, 12 I. C. C. 163; Rates on Grain Milled in Transit, 35 I. C. C. 27-32; R. R. Com. v. Southern Pac. Co. 19 I. C. C. 238. And the rule has been applied by state courts in intrastate transportation controversies. Kettenhofen v. Globe T. Co. 70 Wash. 645, 127 Pac. 295, 42 L.R.A.(N.S.) 902, Ann. Cas. 1914B, 776; J. H. Cownie Glove Co. & S. v. Merchants' Dispatch Transp. Co. 130 Iowa, 327, 106 N. W. 749, 4 L.R.A.(N.S.) 1060, 114 Am. St. 419. In fact the identical contract here before the court was held by the Interstate Commerce Commission in Superior Commercial Club v. Great Northern Ry. Co. 24 I. C. C. 96, as tantamount to the ownership by appellant of a line to the Head of the Lakes. That view is supported by the case of State v. Chicago & N. W. Ry. Co. 133 Minn. 413, 158 N. W. 627.

Chapter 90 of the Laws of 1913 was intended to prescribe a general tariff as to all shipments over one continuous line, whether owned by two or more companies, or the line be created in the manner here shown by joint traffic agreement. Chapter 344, the joint rate act, which appellant contends controls the case, was intended to cover that class of transportation where the affected lines have no through traffic arrangements and it has no application to the situation here presented. The fact that the Railroad and Warehouse Commission has promulgated a joint rate order thereunder is not therefore material.

Appellant's contract rights are not impaired. The relations between the two railroad companies may continue unaffected and the judgment appealed from will in no way interfere therewith. Appellant will still control the traffic. And though its share of the earnings may be less the obligations of the Northern Pacific Company under the contract remain as before the order was made. Nor do we find that any of the constitutional rights of appellant are infringed; there is no claim of

unreasonableness of the rate.    Interstate commerce is not interfered with.

Judgment affirmed.