## WATAB PAPER CO. v. NORTHERN PAC. RY. CO.

No. 1082.

District Court, D. Minnesota,
Fourth Division.

Dec. 28, 1944.

924

Maurice S. Bush, of Minneapolis, Minn., for plaintiff.

L. B. daPonte, M. L. Countryman, Jr., and Conrad Olson, all of St. Paul, Minn., for defendant.

JOYCE, District Judge.

Plaintiff is a Delaware corporation engaged in the manufacture of paper and paper products at Sartell, Minnesota. Defendant is a Wisconsin corporation operating a railroad in Minnesota on which Sartell is located. This suit is for some $55,000 for alleged excessive rates charged and collected by defendant between November 10, 1936, and October 23, 1941, on shipments of pulpwood to plaintiff at Sartell from points in the northern part of the state on the Minnesota & International Railway Company (hereinafter designated as the "M. & I.") and the Big Fork & International Falls Railway Company (hereinafter designated as the "B. F. & I. F."). The defendant operated a railroad between Sartell and Brainerd; the M. & I. operated the railroad from Brainerd north to Grand Falls; the B. F. & I. F. owned the railroad from Grand Falls northward to the vicinity of International Falls. These lines formed parts of a continuous line from the Twin Cities to the Canadian border. The B. F. & I. F. was not an operating company. Defendant owned its capital stock but the road was operated by the M. & I. For these reasons, and as the B. F. & I. F. did not connect directly with defendant's line and all the shipments involved here passed over the M. & I. as well as the Northern Pacific, subsequent discussion will be limited to those roads.

Plaintiff's case is based on the theory that, for the period complained of, defendant and the M. & I. were one railroad for rate making purposes, but that they treated themselves as separate roads for such purposes and thereby published and collected excessive tariffs on pulpwood in violation of an order of the Minnesota Railroad and Warehouse Commission (hereinafter called the "Commission"). In support of this contention plaintiff adduced proof that defendant owned 70% of the outstanding capital stock of the M. & I.; that five out of seven of the directors of the M. & I. were chosen by defendant; that the two corporations had common officers; that the traffic, accounting, purchasing, legal and claim departments of the two companies were the same; that defendant had made certain admissions to its stockholders that it controlled the M. & I.; and that the M. & I. was heavily indebted to defendant for operating expenses and the latter held a mortgage on all the property of the M. & I. (this mortgage was foreclosed October 23, 1941. Since that date defendant has operated the M. & I. as a branch line and has applied the single line rates. Therefore, subsequent shipments are not involved in this proceeding).

On the other hand, defendant introduced evidence tending to prove that the corporations kept separate books; that they had separate maintenance forces, station employees and operating crews; that the M. & I. made its own purchases; that it made its own reports to other carriers for interline traffic and collected balances owing to it; that it paid defendant for joint use of the station at Brainerd, for heavy repairs, and rolling stock under the per diem rules of the Association of American Railroads; that separate contracts were entered into with the United States Railroad Administration during the period of federal control and with the railroad brotherhoods; that

separate reports were made to the Interstate Commerce Commission and the Minnesota Railroad & Warehouse Commission and the federal and state taxing authorities; that the M. & I. owned its own locomotives and pulpwood and box cars; that it charged defendant for the carrying of its materials and private cars; that passes on one road were not honored by the other; and that at all times the minority interests in the M. & I. evinced a strong and active interest in its affairs.

There is little dispute on the evidentiary facts. The merits of the controversy involve the determination of whether the facts permit the inference that defendant and the M. & I. were one road for rate making purposes or whether they were separate roads for such purposes. Aside from defending on the merits, defendant seriously contends that this court is without jurisdiction to determine the subject matter of the controversy.

It is plaintiff's position that defendant has charged rates in violation of an order of the Commission dated December 10, 1913, which was promulgated pursuant to chapter 90, Laws of 1913, Minn.St.1941, sec. 218.46, Mason's 1940 Supp. § 4843, otherwise known as the "Distance Tariff" Law. This order pertained to rates to be published for the carriage of freight on a single line of railroad. The tariffs which were applied to the shipments involved here were admittedly not published pursuant to this order of the Commission because, as defendant contends, defendant and the M. & I. were not a single line for rate making purposes. The tariffs charged were in fact published in accord with an order of the Commission dated July 27, 1914 (and its subsequent amendments) known as the "Joint Rate Order" which was promulgated pursuant to chapter 344, Laws of 1913, Minn.St.1941, § 216.54, Mason's St.1927, § 4700. Defendant contends that the two roads were distinct for rate making purposes, that the published rates were the proper ones, that the Commission has so determined, and that that determination is not reviewable here in a collateral proceeding. Plaintiff does not contend that the charges collected were not in accord with tariffs published consistent with the Joint Rate Order. The ultimate question is thus narrowed as to which order of the Commission applied to these rates; that is, the Single Line or Joint Rate Order.

After the enactment of chapter 344, Laws of 1913, supra, the Commission published a Tentative Joint Rate Order coupled with an order directed to certain designated railroads including defendant and the M. & I., to show cause why it should not be adopted. Extensive hearings were had at which the railroads, including defendant and the M. & I. appearing separately, and numerous shippers were represented. An examination of the testimony received by the Commission at these hearings leaves no doubt that the question of applying joint rates to these two roads and the ramifications involved were considered by the Commission. Pertinent to the issues here is the following colloquy which occurred at the hearings of May 26-27, 1914, between Mr. L. A. Page, Jr., representing a shipper of forest products, and Judge Mills, then chairman of the Commission:

"Mr. Page: * * * our business depends on whether the M. & I. is a distinct road, or whether it is a continuous mileage with the N. P. If that is a continuous [sic] mileage, it will wipe our yard out at Minnesota Transfer; we cannot stand the increase; I don't know what position the Commission is going to take with regard to that."

"Mr. Mills: We have been advised by the Attorney General those are separate roads.

"Mr. Page: If that is so we see our finish. * * * On account of the combination in over the M. & I. and N. P. where we have our principal line of business, our stumpage, and all of our producing points are on the M. & I., and by the joint rate on the mileage of both roads, which brings us up too high to do business. On a continuous mileage we would not be at such a great disadvantage, only a cent more, which we could absorb."

Chairman Mills then questioned Mr. Page as to what the rate was, where his company shipped to, who its competitors were, and why it had a yard at Minnesota Transfer, which was claimed would be eliminated by the application of joint rates over the M. & I. and N. P. At the same hearing a Mr. T. M. Partridge, representing a producer of cedar posts and ties, stated to the Commission: "I might further say that the Cashman law, if it treats the M. & I. and the Northern Pacific as independent lines, would raise the rates on

cedar products from points on the M. & I. to the Minnesota Transfer about 50%."

He then continued with an explanation of other proposed rate changes and a member of the Commission interposed a question:

"Q. That is, using those two lines as separate railroads? A. Yes, sir.

"Q. What would be the rate if it was a single line?"

Enough has been recited to show that the very contentions advanced by plaintiff here were put before the Commission in the 1914 hearings by shippers who, like plaintiff, shipped from points on the M. & I. to points on the Northern Pacific and would be adversely affected by applying the joint rate order to these roads.

The hearings were followed by the Joint Rate Order of July 27, 1914. It was addressed to twenty-six separate railroads, including the M. & I. and Northern Pacific by name, and ordered them to make joint through rates on certain percentages of local rates not material here. Rule III of the order is entitled "Exceptions". Therein the "Omaha" and "Northwestern" roads are given special treatment, and twelve others, not including either the M. & I. or the defendant, are exempted from certain provisions of the order. Rule XI of the order reads: "Each carrier not exempted by this order is required to establish joint rates in accordance with these rules to apply through all points of connection within the state of Minnesota, to take effect Monday the 10th day of August A. D. 1914. This may be done by naming the rates or providing specific rules to govern in making them."

In short, the Commission was aware of the situation existing between the M. & I. and the defendant and had apparently sought the advice of the Attorney General with respect to it. It was aware that shippers contended they should be considered as one road and testified as to the effect of considering them as separate roads. Nevertheless, the order is directed to each railroad separately, the rule on "Exceptions" mentions neither, and the order is specifically directed to carriers not exempted therefrom. The very fact that defendant and the M. & I. were separate corporations each operating a railroad and were treated as separate roads for all other purposes both at that time and since demonstrates that, on its face, the joint rate order was

to apply to them. To exempt them from the order it would have been necessary to make a specific exemption as was done in the case of some other roads. Nor can it be said that the Commission was remiss in its duty and did not pass upon the question. The testimony before the Commission shows that the issue was squarely presented and subsequent actions by the railroads, shippers and the Commission itself confirm the fact that the Commission did determine that defendant and the M. & I. were separate railroads for the purposes of the joint rate order.

The next question is whether this determination by the Commission can be reviewed or redetermined here in a collateral proceeding. Minn.St.1941, sec. 216.24, Mason's St.1927, § 4650, prescribes the procedure for appeals from an order of the Commission to the state district court. According to the statute, "Any party to a proceeding before the commission, or any party affected by any order thereof, or the State of Minnesota, by the attorney general, may appeal * * *", or the Commission on its motion can commence a proceeding in the district court to compel compliance. This record does not disclose that the Commission ever commenced such a proceeding to compel the M. & I. and defendant to file single line schedules. However, there was an appeal, taken by a shipper, from the Joint Rate Order of July 27, 1914, insofar as that order treated the "Omaha" and "Northwestern" as separate railroads for rate making purposes. The District Court reversed that part of the order and was affirmed in State ex rel. Hall v. Chicago & N. W. Ry. Co., 133 Minn. 413, 158 N.W. 627. Plaintiff relies on the facts of this case by way of analogy, but there is nothing in the opinion to indicate the courts could have determined the question in any other manner than following the statutory procedure.

After the above decision and apparently because of it the Commission on its own motion, and without complaint on the part of shippers, initiated proceedings entitled: "In the Matter of the Northern Pacific, M. & I. and B. F. & I. F. Railway companies being considered as one line for rate making purposes." and directed to the named railroads an order to show cause why they should not be so considered. A hearing was held October 10, 1916, at which the railway companies and Backus-Brooks Lumber Co., which was the minority stock-

holder in the M. & I., appeared, Considerable testimony was taken and the hearing was adjourned without date as the Commission stated it wished an opportunity to examine the exhibits before cross-examining the witnesses and hearing argument. However, the hearings were never resumed and no formal order of the Commission was ever made. It has been suggested that the reason for this was the intervention of World War I and the Government's assuming operation of the railroads. Whatever the reason, the matter was pursued neither by the Commission nor any shipper. In the absence of an order by the Commission its previous position remained unchanged and everyone proceeded on that assumption for over twenty-five years. The very fact that these hearings took place is highly persuasive, it seems to me, on the point that the Commission had previously determined that the joint rate order applied. If the contrary had been true and if the Commission had been of the opinion that single line rates should be applied, these hearings would have been superfluous and it would have been the duty of the Commission, obviously being aware that the defendant and M. & I. were applying the joint rate order, to proceed by mandamus, as in State ex rel. Smith v. Chicago, M. & St. P. Ry. Co., 139 Minn. 55, 165 N.W. 869, and compel obedience to the single line order.

There has even been litigation concerning the proper division of the joint rates collected, by defendant and M. & I. See Backus-Brooks Co. v. Northern Pacific Railway Co., 8 Cir. 21 F.2d 4, which was a suit brought by the minority stockholder of the M. & I. There the court said that chapter 344, Laws of 1913, Minn.St.1941, § 216.54, Mason's St.1927, § 4700, gave the Minnesota Railroad and Warehouse Commission wide powers over joint rates from which it was implied that the Commission had power to fix the apportionment of such rates between the carriers and held that this court was without jurisdiction to determine that question in the absence of preliminary resort to the Commission. If this court has no original jurisdiction to determine an apportionment of revenues collected under this joint rate order, it would seem to necessarily follow that it has no jurisdiction to review the order itself.

State ex rel. Smith v. Chicago M. & St. P. Ry. Co., supra, involved the same question as here; i. e., whether the single line or joint rate order applied to respondent's shipments from Duluth and vicinity to points south of St. Paul, it being the railroad's contention that shipments from Duluth and vicinity to St. Paul were over the Northern Pacific and that it and the "Milwaukee" were separate roads for rate making purposes in spite of their traffic arrangement. The courts held adversely to this contention. But that was a mandamus proceeding brought by the Attorney General to compel obedience to the order of the Commission, which, as the court said, "on its face was made applicable to appellant * * *." 139 Minn. at page 56, 165 N.W. at page 870. The original petition and alternative writ of mandamus clearly state that the refusal and failure to publish rates were reported by the Commission to the Attorney General for his official action. For the course pursued there is statutory sanction. Minn.St.1941, § 218.19, Mason's St.1927, §§ 4788, 216.10, Mason's St.1927, §§ 4635, 4658.

Minneapolis Civic & Commerce Ass'n v. Chicago M. & St. P. Ry. Co., 134 Minn. 169, 158 N.W. 817, involved the question of whether the Minneapolis Eastern Railway Company was a separate road or a part of the switching facilities of the "Milwaukee" and "Omaha" railway systems. The action was commenced on behalf of shippers by petition to the Commission, which held hearings and made findings. This procedure is likewise prescribed by statute. Minn.St.1941, §§ 216.13 to 216.18, Mason's St.1927, §§ 4638 to 4643. The Commission's order was appealed from as in State ex rel. Hall v. Chicago & N. W. Ry. Co., 133 Minn. 413, 158 N.W. 627.

In passing, it may be noted that Pontiac, O. & N. R. Co. v. Michigan Railroad Commission, 203 Mich. 258, 168 N.W. 927, involved the determination of whether two railroads were one for purposes of rate making. This case, too, reached the courts by way of appeal from a preliminary determination by the Commission.

█ Nothing in these cases nor in the pertinent statutes indicates that the correctness of such a determination by the Commission can be reviewed or redetermined in a collateral proceeding such as this. Nor has plaintiff cited any such case or statute. Plaintiff does contend that it is not limited to statutory remedies but may raise the question collaterally in a common law action for damages. Plaintiff cites Minn.St.

1941, § 217.41, Mason's St.1927, § 4708, which is to the effect that the statutory remedies relating to the Railroad and Warehouse Commission and to common carriers shall not be construed so as to abridge or limit common law remedies but that they are in addition thereto. Plaintiff points out that it has no statutory civil remedy before the Commission as that body has no reparatory powers. It also cites Sullivan v. Minneapolis & R. R. Ry. Co., 121 Minn. 488, 142 N.W. 3, 45 L.R.A.,N.S., 612, which was a suit based on discrimination in rates and where it was held that the statutory remedies did not exclude or repeal by implication previously existing common law remedies. Undoubtedly this is the law, but it remains for plaintiff to show that it has a common law action to revise, modify or overrule an order of the Commission that that body had the power to make. Obviously, there was no such common law action. Nor does plaintiff so contend. Its initial premise is that the Commission did not determine that the joint rate order applied to defendant and the M. & I. but that the order was general in nature and was misapplied by the railroads. As shown above, my conclusion is that the Commission did determine that the joint rate order applied. Assuming that plaintiff would have a common law action for rates charged in excess of those prescribed by that order, the question is moot here as no such violation is alleged; in fact, plaintiff concedes that the rates charged were the correct joint line rates.

As an administrative body the Commission has wide authority in exercising its jurisdiction. It is conceded that it has the power to determine whether defendant and the M. & I. were one or separate roads for rate making purposes. As I view this evidence, it has exercised that power and determined that the joint rate order applied. There was no appeal from this part of that order nor any subsequent petition by plaintiff or any other shipper to the Commission to review its findings. Shipper and the railroads alike assumed that the joint rates were applicable for over a quarter of a century. In view of these facts, it is my conclusion that this court cannot now review the Commission's decision and is without jurisdiction to determine, on its merits, whether or not defendant and the M. & I. were a single line for rate making purposes between 1936 and 1941.

The chaotic condition that would result from a contrary conclusion can readily be seen. A decision on the merits here would not necessarily bind another court in a suit by another shipper, and on different evidence different results might well be reached. To compel each shipper to relitigate the question and to risk contrary results would be inimical to the public interest. Because carriers and all their activities and particularly those dealing with rates are of vital public concern, they are closely regulated by statute and the Commission is given the extensive powers that it has. It is my opinion that in the absence of statutory authority, this suit cannot be maintained.

This memorandum is made a part of the findings of fact and conclusions of law which will be filed herein, to all of which the plaintiff is accorded an exception.