## STATE v. GREAT NORTHERN RAILWAY COMPANY.[1]

November 14, 1924.

No. 23,542.

**Gross earnings of defendant on carriage of ore.**

1. From 1903 to 1912 inclusive the defendant Great Northern Railway Company carried ore from the Mesaba iron range in Minnesota to the docks in Allouez Bay in Wisconsin where the ore was loaded from its cars into boats for transportation to the lower lake ports. The line from the range to Saunders in Wisconsin originally was owned by the Eastern Railway Company of Minnesota, was under lease to the Great Northern for a time, and was later purchased. The legal title of the line from Saunders to the water front, including the dock, was at first in the Duluth, Superior & Western Terminal Company, later partly in the Great Northern and partly in the Allouez Bay Dock Company, and at the end of the period in the Great Northern. It is *held*, under the evidence recited in the opinion, that the Great Northern during the whole period was the beneficial owner of the line of transportation from the mines to the boats; that the haul was a line haul; that the freight received constituted gross earnings of the Great Northern apportionable on a mileage basis in accordance with the provisions of the gross earnings statute; that no part of it was apportionable to the Terminal company or the Allouez company upon the theory that they were separate corporations participating in the haul; and, further, that the Great Northern could not deduct from the earnings of the line haul, in computing its gross earnings, sums apportioned to the Terminal company or to the Allouez company, upon the theory that services of a special character, apart from the line haul, for which a separate charge could be made, were rendered in the terminal yards and upon the dock.

[1]Reported in 200 N. W. 834.

**No recovery allowed for years 1901 and 1902.**

2. The ore haul from 1901 to May 1, 1902, was an Eastern operation and from May 1, 1902, a Great Northern operation. The evidence does not show the division of the earnings for 1902. Proceedings to charge a tax for the gross earnings of the 1901 and 1902 haul were against the Great Northern and not against the Eastern. Later the Great Northern purchased the Eastern and assumed its liabilities. This was not alleged. The allegation of the complaint was that the Great Northern omitted to return the earnings of these years. It is *held* that there could be no recovery for 1901 or 1902, and conceding that there could be a recovery under the assumption agreement, if pleaded, an amendment should not be allowed or the want of an allegation overlooked when a principal object of the state, in sustaining a tax of a comparatively small amount for 1901 and 1902, was to recover harsh penalties for 1903 to 1912.

**No recovery allowed for interest or penalties.**

3. By Laws 1913, c. 487, a direct penalty of five per cent is imposed, and an interest penalty of one per cent per month. In the proceedings to charge the Great Northern with taxes on its gross earnings the assessment and auditor's draft were largely in excess of the amount due the state, and of the amount which it recovers under the holding in Paragraph 1. It is *held* that the state cannot recover penalties or interest; and that Laws 1917, p. 573, c. 398, permitting a railroad to pay a part of the auditor's draft, does not entitle the state to interest, dating from the passage of the statute, upon the taxes here involved.

Action in the district court for Ramsey county to recover $536,402.18 and interest. The case was tried before Hanft, J., who ordered judgment against defendant for $479,580.58. From the judgment for that amount and for $13,108.52 interest defendant appealed. From the judgment denying recovery for the years 1901 and that part of 1902 prior to May 1, and denying recovery of penalties and interest upon omitted earnings or taxes for 1903 to 1912, the state appealed. Affirmed on both appeals.

*M. L. Countryman* and *F. G. Dorety,* for appellant.

*Clifford L. Hilton,* Attorney General, *Montreville J. Brown,* Assistant Attorney General, and *Patrick J. Ryan,* for respondent.

DIBELL, J.

This is an action to recover taxes upon earnings of the defendant Great Northern Railway Company from 1901 to 1912, inclusive. The state claims that the defendant when it made its report to the State Tax Commission omitted a portion of its gross earnings. By this action it seeks to recover taxes thereon.

The term "gross earnings" means "all earnings on business beginning and ending within the state, and a proportion, based upon the proportion of the mileage within the state to the entire mileage over which such business is done, of the earnings on all interstate business passing through, into or out of the state." G. S. 1913, § 2227.

In 1901 and for a few years prior the Eastern Railway Company of Minnesota owned a railroad extending from the mines on the Mesaba range in St. Louis and Itasca counties, Minnesota, to Saunders, just out of Superior, in Wisconsin. From there a railroad extended to Allouez Bay and connected with an ore dock therein. The road and the dock were owned by the Duluth, Superior & Western Terminal Company, which was, as hereafter noted, through the ownership of its stock, a Great Northern organization. Later the title to the dock passed to the Allouez Bay Dock Company, also, through stock ownership, a Great Northern organization. Over these roads, including the dock, ore was transported from the mines by rail and unloaded into boats for water transportation to the lower lake ports.

The carriage was interstate. The length of the haul from the mine to lake was 107 miles. Of this distance 81.55 per cent was in Minnesota. In reporting earnings from 1903 to 1912 the defendant did not include charges of the haul apportioned by agreement to the dock company, or apportioned to the terminal company for the haul from Saunders to the dock. The earnings from Saunders to and upon the dock for 1903 to 1912, inclusive, and for 1901 and 1902, are the earnings claimed by the state to be omitted earnings. The operation in 1901 and until May, 1902, was an Eastern operation. The amount of the 1902 earnings, from May on, is not shown.

The defendant paid on the earnings apportioned to the haul from

the mines to Saunders on a mileage basis of 81.55 per cent. The court found for the state for taxes upon 81.55 per cent of the earnings apportioned to the haul from Saunders to the water front, or apportioned to the dock company, for the years 1903 to 1912. It held that the state could not recover a tax upon earnings for 1901 and 1902, nor penalties or interest upon the 1903 to 1912 taxes. It directed the dismissal of the action without prejudice so far as it related to omitted earnings for 1901 and 1902. The defendant appeals from so much of the judgment as gives a recovery for 1903 to 1912 inclusive. The state appeals from the portion of the judgment which denies a recovery for 1901 and 1902, and from the portion of the judgment denying a recovery of penalties and interest upon the taxes for 1903 to 1912.

1. The amount of the earnings is not in dispute. The question is whether they were omitted earnings of the defendant.

The defendant denies liability upon two grounds. One is that the terminal company and the Allouez company were separate corporations with which it made a proper division of the earnings of the line haul, and that the balance was its gross earnings. The other is, conceding its beneficial ownership of the road from the mines to the water front, including the dock, that special services were performed by the terminal company and the Allouez company, for which a separate charge represented by the earnings of the line haul apportioned to them was made, and that the sums so apportioned were not a part of its gross earnings subject to tax. The consideration of these defenses involves an inquiry into the physical and stock ownership of the properties and the method of their operation.

In 1887 the Eastern built a road from Hinckley, Minnesota, to Superior, Wisconsin. At Hinckley it connected with the twin cities. Later it built a road to the northwest from near Saunders, a few miles out of Superior on its Hinckley line, to Fosston. From this line it later reached various points on the Mesaba range. The first ore was carried in 1897. From May 1, 1902, until 1907 the road was under lease to the Great Northern. In that year it was bought by the Great Northern.

About 1897 or 1898 the terminal company acquired through purchase at foreclosure sale the dock in Allouez bay, and purchased a railroad line connecting Saunders and the dock. The total length of the two was 7 miles. The crossing of the Omaha road near the land end of the dock was substantially the dividing line of the two, six miles from Saunders to the crossing, and one mile from the crossing to the farthest end of the dock. It continued its ownership until June 1, 1903, when it leased all except the dock property to the Great Northern, and the dock property to the Allouez company, just then organized. On August 1, 1908, it sold the six-mile road to the Great Northern and the dock to the Allouez company. The Great Northern had working agreements with the Allouez company, one dated June 1, 1903, the other dated August 1, 1909, in some respects in the nature of leases, whereby it carried its ore under its own motive power onto the docks. The dock company unloaded it into the boats. In the early part of 1913, but as of December 31, 1912, title passed from the dock company to the Great Northern. The Great Northern then had legal title to the line of transportation from the mines to the lake boats.

The stock ownership during the periods important in this controversy is traceable, with the Great Northern, as it ought to be, the active dominating power at the beginning and at the close in stock ownership and railway and dock operation. It owned the stock of the Eastern as far back as 1900. It owned the stock of the terminal company from 1897 or 1898 until October 20, 1899, when it was transferred to the Lake Superior Company, Limited. This company was an association organized under the statutes of Michigan by Great Northern interests. It was a holding company. It held in trust the stock which the Great Northern transferred to it. The disposition of the stock was subject wholly to the direction of the Great Northern. It was the Great Northern's agent. The Lake Superior Company and the Great Northern Ore Trust, hereafter mentioned, and the character of their organization and their relation to the Great Northern, are considered in Venner v. Great North. Ry. Co. 117 Minn. 447, 136 N. W. 271, and in In re Thorne, 145 Minn. 412, 177 N. W. 638.

The Allouez company was organized in 1903. Its stock was issued to the Lake Superior Company, Limited, the holding company for the Great Northern. In November, 1906, the income of the two companies from then on until December 31, 1912, was assigned at the direction of the Great Northern to the ore trust. The stock of the Allouez company was held by the Lake Superior company until 1908, when it was transferred to the West Missabe Land Company, Limited. The transfer was directed by resolution of the Great Northern directors as provided in the articles of association of the Lake Superior Company. The stock of the West Missabe company had been owned by the Great Northern and was transferred to the Lake Superior Company by the instrument of October 20, 1899, which transferred the Terminal company stock. The agreement creating the Great Northern Ore Trust was executed on December 6, 1906, by the Lake Superior Company, holding property of the Great Northern in trust, and the trustees, who were in official control of the Great Northern. It was a Great Northern creation. Donor and trustees and beneficiaries and subject of the trust, all were Great Northern. Certificates of beneficial ownership in the trust were distributed to the Great Northern stockholders, certificate for share. Then began a divergence in the ownership of the stock and the certificates as one or the other was sold separately.

The evidence does not show all of the transaction resulting in the transfer of the future income of the Allouez company to the ore trust in 1906, the transfer of the Allouez stock to the West Missabe company in 1908, and the transfer of the Allouez stock at the close of 1912 to the Great Northern, at which time the latter acquired also legal title to the dock property. It is not believable that in 1908 the Great Northern, having then the legal title of the railroad from the mines to the Omaha crossing, and owning the stock of the Allouez company, divested itself of the beneficial ownership of the one-mile dock property essential to the completion of its ore carriage. At the time of the transfer of the future income of the Allouez company to the ore trust in 1906 the Allouez company was enjoying a profitable business. In the two years before its dividends were not much less than two millions. In the six years

following the dividends were substantially one and one-third millions annually. No carrier in absolute control of the transportation line from mine to boats, owning in its own name the legal title to all of the line except the dock, having the advantages of the ownership of that through the ownership of all of the Allouez stock, and having so profitable a haul, would part with the last mile. The Great Northern did not. Whatever the form and whatever the agency the Great Northern kept the beneficial ownership. From the beginning it controlled the ore traffic. It received all the freight earnings. It was the beneficiary of all the income from its two organizations, the terminal company and the Allouez Company, which it officered and controlled.

Neither in 1900 nor afterward did the Great Northern interests have a thought of operating an ore hauling line from the mines to Saunders, and depending upon another railway to carry it to the boats; nor of operating a line to the Omaha crossing and depending upon a separate dock company to complete the carriage. Ore transportation from the Minnesota mines might have developed through separate ore hauling lines, competing at the mines, and carrying to one or more public or independent docks on the water front serving all roads. But it did not. It developed through lines, to some extent competing for traffic at the mines, owning and operating their own docks and carrying the ore from the mines and putting it into the holds of the boats. And the Great Northern was like the others. We do not mean that an ore carrier having its own docks could not be required to accept ore from other ore-carrying roads. That question is not here. It appears in evidence that in 1919 the defendant received at Saunders ore coming over the Duluth, Missabe & Northern Railway from the Pettit mine, and apportioned charges. There has been no general occasion for a transfer from the road of one ore carrier to the dock of another.

With the Mesaba mines developing after 1890 the Great Northern interests were in a strategic position. They saw it. The lower end of the Fosston branch of the Eastern was within seven miles of the water front where there was a dock under foreclosure. A six mile line of railroad, which was for sale, connected Saunders and

the dock. It was not difficult to tap the Mesaba range from the Fosston line. The defendant took proper advantage of the situation and its great ore traffic resulted.

No cases controlling upon a situation such as is presented are cited. There may be noted State v. Chicago & N. W. Ry. Co. 133 Minn. 413, 158 N. W. 627, involving a freight rate on two railroads closely related in ownership and operation; Minneapolis C. & C. Assn. v. Chicago, M. & St. P. Ry. Co. 134 Minn. 169, 158 N. W. 817, involving terminal charges where two railroads owned the stock of the terminal company and controlled its operation; Steenerson v. Great North. Ry. Co. 69 Minn. 353, 72 N. W. 713, involving a freight rate; Specht v. Missouri Pac. R. Co. 154 Minn. 314, 191 N. W. 905, involving a personal injury occurring on the line of a corporation the stock of which was owned by the defendant which operated it as a part of its system; and State v. St. Paul Union Depot Co. 42 Minn. 142, 43 N. W. 840, 6 L. R. A. 234, where it was held that the Union Depot Company whose stock was owned by the railroads using it, they paying a gross earnings tax, was not subject to an earnings tax. It is well understood that one corporation by means of stock ownership may be the agent of another. U. S. v. Delaware L. & W. Ry. Co. 238 U. S. 516, 529, 35 Sup. Ct. 873, 59 L. ed. 1438; Erickson v. Minnesota & Ontario Power Co. 134 Minn. 209, 158 N. W. 979. The question of control through stock ownership is considered in Pearsall v. Great Northern Ry. Co. 161 U. S. 646, 16 Sup. Ct. 705, 40 L. ed. 838; Northern Securities Co. v. U. S. 193 U. S. 197, 24 Sup. Ct. 436, 48 L. ed. 679; Southern Pac. Ter. Co. v. Interstate Com. Comn. 219 U. S. 498, 31 Sup. Ct. 279, 55 L. ed. 310; U. S. v. Lehigh Valley R. Co. 220 U. S. 257, 31 Sup. Ct. 387, 55 L. ed. 458.

The portion of the earnings of the interstate haul apportioned to the terminal company or to the Allouez company were Great Northern earnings, apportionable to the line haul on a mileage basis as "earnings on all interstate business passing through, into or out of the state," within the statute, and therefore omitted earnings, unless they were charges for special services not apportionable to

the line haul, a claim made by the defendant and now to be considered.

The trial court found "the said ore line, from the 1st day of January, 1901, to said 31st day of December, 1912, from the mines in Minnesota to and including the docks at Allouez Bay, was a single, continuous railway line. * * * There was but a single charge, during all of said period, for a continuous, unbroken railway service."

The finding describes the freight service. Ore was carried for a fixed charge from the mines and put into the boats on lake water. This is the character of the haul on all the ore-carrying roads. After 1906 the Great Northern's published tariff was for a completed carriage. Its actual tariff was the same before. Charges paid by a carrier to other companies for distinct and independent services in the course of through transportation may not be gross receipts within a taxing statute. State v. Illinois Cent. R. Co. 246 Ill. 188, 92 N. E. 814. Of course charges for incidental services may be added, in proper cases, to the fixed tariff. Interstate Commerce Comn. v. Chicago, B. & Q. R. Co. 186 U. S. 320, 22 Sup. Ct. 824, 46 L. ed. 1182; Southern Ry. Co. v. St. Louis H. & G. Co. 214 U. S. 297, 29 Sup. Ct. 678, 53 L. ed. 1004; Interstate Commerce Comn. v. Stickney, 215 U. S. 98, 30 Sup. Ct. 66, 54 L. ed. 112.

There is in evidence a tariff for 1919 showing a 95-cent rate from the range with a storage and unloading charge of 5 cents added, and we understand something of this kind to be usual. A differential is proper because some of the Minnesota ore, though but a small percentage, is used in Minnesota, or passes out of the state by rail, and uses no dock. At the time of the matters here in controversy the Minnesota ore used in Minnesota, or passing out by rail, was negligible in quantity. The facts of transportation would be described quite as accurately if a deduction of 5 cents from the dollar were made for ore not using the docks.

The defendant never regarded the service in its yards or the service on the docks as something for which an additional charge could be made. No such charge ever was made. Everything which was done with the ore from the time it started from the mines and

until it was put into the boats and the boats trimmed was included in the haul. Reference is made to the thawing of ore on the dock, sometimes necessary in the late fall. Compared with all the ore passing into the dock it amounts to nothing. No specific charge is ever made for it. The expense is absorbed in the freight rate on all the ore and not charged against the specific ore receiving the service. The same is true of the storage service furnished to particular ore. The ore receiving the service is not charged for it. It is absorbed in the freight charge on all ore. Reference is made to the services in the yard between Saunders and the Omaha dock. Sorting the cars was necessary so that when they went upon the dock they would be unloaded in the proper boats. Every railway has extra work at its terminals. The expense of it is absorbed in the tariff. We do not get from the evidence the notion that the yard sorting or the work on the docks was an unusual burden. The cars moved in solid trains of hopper bottom cars, made a quick run from the mines, were sorted and hauled onto the high docks, were cared for promptly at the beginning of lake transportation, and were on the way back to the mines with little waste.

The character of the docks in Wisconsin has had consideration by the courts of that state. In City of Superior v. Allouez Bay Dock Co. 166 Wis. 76, 80-81, 164 N. W. 362, 364, a proceeding to enforce taxes on the dock company's income for 1911, the Wisconsin court viewed the dock company in this way:

"The ore which it handled was all consigned from the Minnesota mines to lower lake ports, and simply passed through the defendant's docks in its transit, the defendant receiving a fixed charge for its part in facilitating the continuous interstate voyage, namely, the transferring of the ore from the land carrier to the water carrier."

And again:

"It was used exclusively as a railroad terminal and hence should have been assessed and taxed as a railroad. It is said that it cannot be so taxed because the defendant corporation was not a railroad corporation, but a corporation organized for dock and warehousing purposes, and hence that it would be violating the law if

it attempted to do a railroad business. The argument is fallacious. When a railroad operates a terminal itself, or when a terminal is owned by a third person or corporation and operated solely as a terminal for the railroad, it is as truly a part of the railroad as its trains, and its business as truly a part of the railroad business as the operation of the trains. No reason is perceived why, for the purposes of taxation, such property should not be classified as railroad property and subjected to the same methods of taxation."

In Minneapolis, St. P. & S. S. M. Ry. Co. v. Douglas County, 159 Wis. 408, 412-413, 150 N. W. 422, 423, there was involved the taxation of the Soo line ore dock in Superior. The Soo line is a carrier of ore from the Cuyuna range in Minnesota. The court said:

"Terminal facilities, such as freight houses, grain elevators, and warehouses, owned by the carrier, equipped with the proper appliances necessary to enable the railroad to perform its full duty of transportation and delivery of freight of all kinds, either to the consumer, the dealer, or a connecting carrier, constitute property necessarily used in the operation of a railroad, and hence became part of the entirety. * * *

"The fact that a considerable part of the ore-dock structure was made necessary in order to facilitate the transfer of the ore to lake carriers does not logically divest it of its character as a railway terminal. Necessarily it is a terminal facility of a specialized character, but just as truly a terminal facility."

The sums apportioned to the terminal company and the Allouez company were not service charges as distinguished from line haul charges. They were line haul earnings apportionable on a mileage basis.

2. Judgment for taxes upon omitted earnings for the years 1901 and 1902 was properly denied. The transportation for the period prior to May 1, 1902, was an Eastern operation. After May 1, 1902, it was a Great Northern operation. The evidence gives no basis for a division of earnings between the two companies for the year 1902, so that a tax upon earnings after May 1, 1902, can be charged against the Great Northern.

On August 30, 1913, the public examiner, proceeding under Laws 1913, p. 713, c. 487, reported the omission by the Great Northern of earnings for the years 1901 to 1912, inclusive, with a penalty of 5 per cent and interest from April 23, 1913, the date of the enactment of the statute, at one per cent a month. On September 2, 1913, the Tax Commission certified the amount of the omissions, with penalties and interest, to the state auditor. The state auditor then drew a draft upon the defendant for the amount of the tax, with penalty and interest. Payment was refused.

The proceeding by the state authorities to charge the defendant with taxes on omitted earnings was against the Great Northern. There was no proceeding against the Eastern. The state insists that the Great Northern is liable for the Eastern earnings from January 1, 1901, to May 1, 1902, upon its assumption of the liabilities of the Eastern when it purchased the road in 1907, or perhaps upon the principle of law when one corporation purchases all of the property of another it takes also its liabilities. There is in the complaint no claim of liability of the Great Northern for the Eastern earnings of 1901 and 1902. We are asked to consider the complaint amended or disregard the want of an allegation of assumption. The purpose of the state is not so much to recover taxes upon the comparatively small earnings of 1901 and 1902 as to maintain a recovery of the harsh penalties accruing on the large earnings for 1903 to 1912. The effect of a failure to take proceedings against the Eastern aside, upon which we express no opinion, the court does not incline to the allowance of an amendment or to overlooking the want of an allegation, so as to permit the recovery of penalties not otherwise recoverable.

3. The right of the state to assess omitted earnings is not questioned.

The statute provides for a direct penalty of 5 per cent and an interest penalty of one per cent a month. The assessment was against the Great Northern for all of the years from 1901 to 1912 inclusive. The draft was drawn for that amount including penalty and interest from April 23, 1913, the date of the enactment of the statute. It was largely in excess of the amount actually due. The

defense was justifiable and in part successful. There was no opportunity to pay the amount due without paying the excessive amount claimed. Interest and a penalty should not be imposed. County of Redwood v. Winona & St. Peter L. Co. 40 Minn. 512, 42 N. W. 473; U. S. Trust Co. v. New Mexico, 183 U. S. 535, 22 Sup. Ct. 172, 46 L. ed. 315; Gallup v. Schmidt, 154 Ind. 196, 56 N. E. 443; Lake Shore & M. S. Ry. Co. v. People, 46 Mich. 193, 9 N. W. 249.

It was provided by Laws 1917, p. 573, c. 398, among other things, that uncollected drafts then in the hands of the attorney general should be delivered to the treasurer. The treasurer was authorized to receive part payment. The state insists that after this statute the interest penalty should commence. We do not take this view.

We refrain from an unnecessary discussion of the applicability of the five per cent direct penalty or the time when, under the 1913 act, the one per cent a month interest penalty upon omitted earnings commences.

Judgment affirmed on both appeals.