## STATE OF MINNESOTA *v.* ST. PAUL UNION DEPOT COMPANY.

### December 6, 1889.

**Taxes—Union Depot Company.**—The St. Paul Union Depot Company is not liable to pay, as taxes, a percentage on its receipts or gross earnings.

**Same.**—Payment of a percentage on their gross earnings by the railway companies which own all the stock and use the terminal facilities of the depot company, constitutes payment of taxes on all the property of the latter.

This was an ordinary civil action, brought in the district court for Ramsey county, to recover $10,450.59, claimed to be due to the state as a percentage on the defendant's gross earnings for the years 1883 to 1887, inclusive, in lieu of ordinary taxation on its property, pur-suant to the legislation cited in the opinion. The action was tried by *Vilas*, J., who ordered judgment for the state for the full amount claimed. A new trial was refused, and the defendant appealed.

*Gordon E. Cole,* for appellant.

*M. R. Tyler,* for the State.

MITCHELL, J. The sole question presented by this appeal is the liability of the defendant, under the act of March 10, 1873, (Gen. St. 1878, c. 11, §§ 128, 129,) to pay, as taxes, a percentage on its receipts or gross earnings. It was organized under title 1, c. 34, Gen. St., and the general nature of its business, as stated in its articles of incorporation, is "to build, purchase, or lease and operate transfer tracks or railways in the city of St. Paul, open alike to the use of all railroads now constructed, or which may hereafter be constructed, to or into St. Paul, to and between each of said roads and each and all important industries in said city whose business requires special railroad accommodations by means of transfer tracks, etc., and in connection therewith to build, lease, or otherwise provide and maintain in said city a union passenger depot, and proper tracks for access thereto; and to that end to construct, purchase, lease, or otherwise secure, maintain, and operate lines of railway in said city." In connection with these articles, and as in fact a part of

them, must be considered the act of March 5, 1879, "relating to the St. Paul Union Depot Company," (Sp. Laws 1879, *c.* 318,) the provisions of which were accepted by it, and under and in accordance with which its business has been managed. This act provided that any railroad then or thereafter constructed and running to or into St. Paul might subscribe to the capital stock of defendant, or become a stockholder therein. It also provided that the board of directors of the defendant should be elected annually by seven several railroad companies interested therein, each railway company electing one director. Also, that any other railroad company then or thereafter organized, whose road should run into St. Paul, might, upon becoming the owner of such shares of the capital stock as defendant's board of directors should deem equitable, elect, in like manner, an additional director. The act also prohibited any unjust discrimination against or in favor of any particular railroad company using, or desiring to use, defendant's terminal facilities, and provided that as far as practicable all railroads should have the right to use them upon the same terms. It is evident that this act contemplated that the entire stock of defendant should be owned by and equitably apportioned among the various roads desiring to use its terminal facilities, for it is not to be supposed that the legislature intended that such railway companies should have the exclusive management of the corporate property and business while the stock should be owned by some one else. It is also apparent that it was never intended or contemplated that defendant should do what may be termed a "separate and independent railroad business of its own," but that it was merely designed as an agency through which there might be furnished, for the common benefit and use of all railroads coming into the city, a union depot and terminal facilities, to better enable them to perform their duties as common carriers in receiving, delivering, and transferring passengers and freight in this city.

In accordance with this act, all of the stock of defendant which has ever been issued was apportioned among and issued to, and has always been and still is owned and held by, the seven (since reduced, by consolidation, to five) railroad companies whose roads then ran into St. Paul, and who then used and still use the depot and

terminal facilities furnished by defendant, its entire board of directors being elected by the same companies. Two other companies, (Minnesota & Northwestern and Chicago, Burlington & Northern,) whose roads have subsequently been built into St. Paul, not yet having agreed with defendant's board of directors as to the terms upon which they should be admitted as stockholders, have been using the depot under an agreement by which they pay therefor a stipulated monthly rent, (apparently and presumably as the equivalent of interest on their equitable share of the cost or value of the plant,) and in addition thereto their proportion of the expenses (not including interest on bonds or dividends on stock) of maintaining and operating the depot and appurtenances. This plant was provided and constructed with the proceeds of stock issued to and paid for by these several companies, and with the proceeds of mortgage bonds issued and sold by the defendant. The greater part of the expense was, however, defrayed out of the proceeds of the mortgage bonds, only a comparatively small amount of stock having been issued. The rentals or tolls for the use of the depot are apportioned among and paid by the different companies in proportion to the amount of such use by each company, and the aggregate annual amount of all rentals and tolls is the actual cost of furnishing and maintaining the plant, estimated on the following basis: *First.* The current expenses of keeping up and maintaining the terminal facilities, and of managing the property and business; *second,* 6 per cent. interest on the mortgage bonds, and an annual 6 per cent. dividend on the amount of paid-up stock outstanding; from which is to be deducted, however, all rents or income received by the depot company from other sources, such as rent of dining rooms, express rooms, news-stands, and the like. The fares or tolls which the different railroad companies charge their passengers or other patrons include the use of these terminal facilities furnished by the depot company, as no distinction is or can practicably be made in that matter between their own roads and the depot of the defendant. For illustration, if a passenger on one of these roads pays his fare from Chicago to St. Paul, this covers the entire transit between the two cities, including the accommodations of the Union depot. Hence, for all the facilities furnished by the defendant

to the railroad companies, and for which it charges them their respective shares of the cost, the railway companies charge their patrons as part of their service, and the whole goes into and forms a part of their gross earnings, upon which they pay to the state as taxes a certain percentage. All of the railway companies who use this Union depot pay to the state, either under the provisions of their special charters, or under the act of March 10, 1873, a percentage on their gross earnings in lieu of taxes on all property held and used by them for railway purposes.

It is evident from this statement of facts that the sole and only function performed by the defendant corporation is to furnish, at cost, a union depot and terminal facilities for the common use of these different railway companies, and that the scheme of forming a corporation for that purpose, and issuing stock, is but a more convenient and economical method of holding the property and managing the business than it would be to hold and manage it as tenants in common. It is also apparent that what is charged the railway companies and received by the depot company for these terminal facilities is nothing more or less than a part of the expenses of the former in transacting their railway business, and that what are called the "earnings" of the depot company are for services for which the railway companies charge their patrons, and are all included in the gross earnings of the companies, on which they pay a percentage to the state. To collect a percentage on these gross earnings, and also a percentage on the gross earnings of the depot company, would be, *pro tanto*, double taxation of the same thing. Or take another view of the case. The stock of the Union Depot Company represents and is the exact equivalent of all the property of that corporation. It is held by the railway companies, under legislative authority, for railroad uses, as fully as would be the depot itself if held by them as tenants in common. Hence payment of the required percentage on the gross earnings of the companies constitutes payment of taxes on this stock, and consequently on the property which it represents, and to tax the stock in the hands of the stockholders, and then tax the property which it represents against the corporation, would clearly be illegal or double taxation. The identity of the property taxed is not affected by the

v.42m.—10

fact that in the one case the tax is paid by the stockholder and in the other by the corporation.    The thing taxed is still the same. *Comm'rs of Rice Co.* v. *Citizens' Nat. Bank*, 23 Minn. 280; *Farrington* v. *Tennessee*, 95 U. S. 679.    If, in the present case, the taxes already collected from the railway companies, and those now sought to be collected from the depot company, were both the ordinary form of taxation, the fact of double taxation would be very apparent; but it is none the less double because in both cases the taxes are in the commuted form.    Neither has the claim of the state in this case any equities.    If the railway companies had owned and used this depot as tenants in common, the percentage on their gross earnings payable to the state would have been the same as now, and yet that percentage would have paid the taxes on the depot the same as on any other property held and used by them for railway purposes.  We cannot see what difference it can make whether they hold the depot property as tenants in common, or put it in the name of a trustee to hold and manage for their common use, or, as in this case, organize a corporation for the same purpose, as a more economical and convenient method of holding the property, managing the business and apportioning the expenses among themselves.    The state plants itself on the technical ground that defendant is a separate and independent legal entity, and that we have no right to consider the functions which it performs, or the relations which it bears to the railway companies who own its stock and use its depot.    We think this is too narrow and technical a view of the case.    When evasions have been resorted to by railway companies or others to escape taxation, we have unhesitatingly looked through the external form or dress to the substance of the transaction, and the same rule should be applied against the state.    By receipt of the percentage on the gross earnings of all the railway companies who use the property of the depot company, and who own all its stock, the state has received its tax once upon all the corporate property of the defendant, and to tax it again by a tax against the depot company would be illegal double taxation.

We attach no importance to the fact that after its organization defendant's board of directors notified the state of its election to accept the provisions of the act of March 10, 1873.    If it was liable to tax-

ation, this notice might be conclusive on the company as to the mode or form of taxation; but there is nothing in it which would operate either by way of contract or estoppel to obligate it to pay taxes for which it would not be otherwise liable.

Order reversed.