St. Paul Union Depot Company *vs.* Minnesota & Northwestern Railroad Company.

August 24, 1891.

**Purpose of Plaintiff's Organization.**—The object of the plaintiff's incorporation considered as being the combining in this corporate organization of all the railroad companies whose lines of road enter or may enter the city of St. Paul, for the purpose of providing and maintaining depot and other railroad facilities for the common benefit of all such railroad companies and of the public.

**Same—Right of Railroad Companies to become Members and Stockholders of Plaintiff.**—In view of this purpose, and construing the provisions of its charter, *held*, that railroad companies entering the city since this corporate organization are entitled, for the purpose of becoming members of the corporation, and sharing in and contributing to the benefits of the organization, to subscribe for and purchase a proper proportion of its stock *at its par value.*

**Same—Existing Members Compellable to Surrender Stock.**—If necessary for this purpose and for a proper apportionment of the stock, the existing members may be required to surrender or sell a part of the stock held by them.

Plaintiff brought this action in the district court for Ramsey county, to restrain defendant from making any connection with the tracks of plaintiff or from running over plaintiff's tracks to its union depot, until defendant should first have complied with plaintiff's by-laws and regulations and become owner of the number of shares of stock of plaintiff deemed equitable by plaintiff's board of directors, and entered into the contract with plaintiff required by it of all companies using its depot. The defendant, among other things, pleaded as a counterclaim that it had already offered to subscribe and pay for at their par value such number of shares of plaintiff's capital stock as plaintiff's board of directors should deem equitable, and to execute the contract required by plaintiff of other companies, and to conform to plaintiff's regulations, etc., and it asked judgment that the plaintiff be required to admit it as a stockholder on its subscribing for $583\frac{1}{3}$ shares of plaintiff's capital stock, and paying therefor at its par value, and on its executing the contract required of other companies. The principal issue raised by the reply was whether the defendant was entitled to receive stock at par, or should be required to pay its actual value, which was alleged to be considerably above par. The action was tried by *Wilkin*, J., who held that defendant could not have a right to use the facilities of the depot without becoming a stockholder, and also that the defendant was entitled to an allotment of $583\frac{1}{3}$ shares at par, irrespective of its actual value. Judgment was entered accordingly. The plaintiff thereupon moved for leave to serve a supplemental reply and for a further hearing and determination as to the matters set forth in such reply; that the judgment be vacated in order that, after such further hearing and determination, such further findings of fact and law and such modification of the judgment be made as the further facts stated in such reply might require. The motion was heard by *Brill*, J., after the retirement of Judge Wilkin from the bench, and was denied. The plaintiff appeals from the judgment and from the order denying its motion. The substance of the proposed supplemental reply is stated in the opinion.

*W. H. Norris*, for appellant.

*Lusk, Bunn & Hadley*, for respondent.

DICKINSON, J.   The plaintiff is a domestic corporation, the general object of the organization of which may be said to have been to secure and afford necessary depot and terminal facilities for railroads running into the city of St. Paul, by means of a combination of all such railroads for that purpose.   Its stockholders are various railroad corporations, at present five in number, operating lines of railroad running into that city.   The defendant, a domestic corporation with a line of railroad running into the city, desires to avail itself of the benefits afforded by the plaintiff's incorporation, and claims the right so to do.   In this action it was decided, in the district court, that, in order that the defendant be entitled to such benefits, it must become the owner of a proper proportion (one-sixth) of the stock of the plaintiff corporation.   Of the whole amount of stock authorized, there was still unissued more than the amount required for this purpose, and the plaintiff was willing to sell such stock to the defendant at what the plaintiff deemed to be the actual value of it, (a price much above the par value,) and thereupon to admit the defendant to the enjoyment of the benefits desired by the latter; but the defendant contends that it should be allowed to purchase its proper proportion of the stock at its par value, without regard to the fact that the property held by and devoted to the use of the depot company may have greatly increased in value.

The principal controversy on this appeal is whether the defendant should be required to pay more than the par value for the stock.   In deciding this question, attention is directed to the peculiar nature and objects of the plaintiff's incorporation.   We had occasion to consider this subject for another purpose in *State* v. *St. Paul Union Depot Co.*, 42 Minn. 142, (43 N. W. Rep. 840,) and the opinion in that case so fully sets forth the character and objects of the corporation that we will avoid repetition by here referring to that statement.

We are of the opinion that it was rightly decided that the defendant should only be required to pay the par value of the stock, which is all that any of the companies composing the corporation have heretofore paid for their stock therein.   This conclusion is most consistent with the purposes and intention entering into the plan of incorporation, as shown in the articles adopted, and in the special

law of 1879, (chapter 318,) which was accepted by the corporation, and became a part of the law of its existence.   It seems apparent that the object sought to be accomplished was to bring all the railroads whose lines of road should enter the city into a legal, acting, efficient combination, as a convenient and advantageous means of providing and maintaining suitable depot and terminal facilities for the common use of all the roads, facilitating transfers from one line of road to another, and contributing to the convenience and advantage both of the railroad companies and of the public.   The scheme contemplated the combination, not only of the railroads entering the city at the time the organization was effected, but of such as should come thereafter.   It was doubtless considered that it would not only be advantageous for the new companies to enter the combination, but desirable on the part of the previous members that they should do so.   For the most complete accomplishment of some, at least, of the obvious purposes contemplated, such a general combination was to be desired.   Not only did the original articles of incorporation indicate that it was intended that the contemplated facilities should be "open alike to the use (under proper regulations) of all railroads now constructed, or which may be hereafter constructed, to or into the said city;" but, by the special law above referred to, any such corporation was empowered to "subscribe to the capital stock of the said St. Paul Union Depot Company, or become a stockholder thereof;" and upon becoming the owner of such a number of shares of the stock "as shall be deemed equitable by the board of directors of the said St. Paul Depot Company," and upon executing an agreement to conform to its by-laws and regulations, and to pay such charges as are required to be paid by the other railroad companies, any such company is declared to be entitled to elect or appoint one member of the board of directors.   By section 4 it is declared:   "There shall be no unjust discrimination against or in favor of any railroad corporation or railroad company using, or desiring to use, the said road, tracks, and union depot of the said the St. Paul Union Depot Company, but the terms, conditions, and regulations adopted for the same shall be, as far as practicable, uniform, and apply alike to all railroads using, or desiring to use,

the said road, tracks, and union depot of the said the St. Paul Union Depot Company."

As being significant of the intention that only the par value should be required to be paid by a railroad company entitled to acquire a membership in this corporation, it is to be noticed that, while it was obviously intended that, from time to time, subsequent to the corporate organization, other railroad companies were to become the owners of stock, and become members of this corporation, provision is made, as above indicated, for determining or apportioning the number of shares which any such railroad company should take, while no provision is made respecting the price to be paid therefor. Both the original articles of incorporation and the amended articles, adopted in 1884, however, provide that the stock shall be divided into a specified number of shares, of $100 each. All this is naturally consistent with the theory that all the companies whose roads enter the city should be permitted to take their proper proportion of the stock, as subscribers, at the value named in the articles of incorporation. Thus would the "conditions" under which different companies might be entitled to the benefits to result from the combination be, "as far as practicable, uniform, and apply alike to all," as the special law requires. On the other hand, if effect be given to the claim of the plaintiff, and if its theory as to the increased value of the depot property, and hence of its stock, be correct, it might directly result in an inequality of burden between the corporations sharing alike in the benefits of the organization, which would be quite contrary to the provisions of the special law, and to the obvious purposes of the corporate organization. The five companies constituting the present membership paid for their stock at the par value of $100 per share; but it is demanded of this defendant that it pay for its proper proportion of the stock at the rate of $342.86 per share, amounting to $200,000 for one-sixth of the stock. It may be readily seen that the admission of new members upon such terms might provide funds sufficient to pay off the whole indebtedness of the corporation, ($250,000,) and, if the stock is to be reapportioned as new members come in, so as to preserve equality in the amount of stock held, it would reimburse to the companies now composing the corporation all

that their stock had cost them, thus giving to them the advantages and benefits of the combination at the expense of the junior members of the corporation.

In view of the peculiar purposes for the accomplishment of which this corporation exists, of the means contemplated and adopted for securing such purposes, and of the conditions relating to the holding of its stock, there would seem to be not much propriety in assigning to it a commercial or market value greater than that fixed in the corporate articles. It is difficult to understand how it could commercially bear a value greater than that, if, indeed, it can be said to have a commercial value. The title of the property which the corporation acquired, improved, and occupies, and upon which the alleged increase in the value of the stock may be supposed to rest, is not an unqualified title in fee-simple. It is conditioned upon the continued use of the premises for the specified corporate purposes. Its value to the corporation, or to its members, consists in its practical usefulness, its adaptation to the actual uses of the organization. That usefulness is not affected by any enhancement in the commercial value of the land. The plan of incorporation was not to secure a profit to the corporation or to its members, in the ordinary sense of the term, but to unite the several railroad companies in the undertaking of providing and maintaining necessary railroad facilities for their common benefit, as well as for that of the public. The income was chiefly derived from the members themselves, by tolls or rates for the use of the depot and other railroad facilities, and was graduated to meet the necessary current expenses, and to pay interest on its bonded indebtedness, and 6 per cent. interest, and no more, on the stock. To a large extent, at least, the amounts of interest received by stockholders may be said to come from tolls or rates paid by themselves. There could be no profit, such as could enhance the value of stock, derived from an income paid by the stockholders themselves. The right to hold this stock, and to enjoy the benefits of the organization, is restricted to railroad corporations whose lines of road enter the city of St. Paul; and by the action of the corporation its stock is made subject to be forfeited if the railroad company holding it fails to avail itself of the use of the facilities afforded, and to

pay the tolls and rentals charged. By resolution of the corporation, it is provided that the stock shall not be transferable. These considerations, from which it would seem to be improbable that this stock can bear a value above par, also go to support the view, already expressed, that it was not originally contemplated that any other than the fixed par value should be paid by the corporations who should be entitled to become stockholders, and to share in and contribute to the benefits of the organization. As it could have hardly been anticipated that the stock would come to have a value greater than the price fixed in the articles of incorporation, it may readily be supposed that no other price was intended to be paid for it. This view of the matter is most consistent, not only with what is expressed in the articles and in the special law, but with the significant omission, already referred to, to make provision with reference to the price to be paid for stock subscribed for. It is consistent, too, with the construction which the corporation itself seems to have hitherto adopted and applied.

After the rendition of the judgment in this action, the plaintiff moved for leave to file a supplemental reply, alleging that, since the completion of the trial, the plaintiff had offered to issue and sell to its present stockholders, at its par value, all the stock which it is authorized to issue, (the limit being $500,000,) and that three of the five stockholders had elected to take their proper proportion of it. This is alleged to have been necessary as a means for providing funds for making needed improvements in the depot facilities, and which have been made at an expense of more than $130,000. The motion was denied, and the plaintiff has appealed both from the order denying the motion and from the judgment. We think that, for at least two reasons, the court was justified in refusing the plaintiff's application. One is that it does not appear that all of the unissued stock has been or will be taken by the present members of the corporation, or that enough will not remain to be issued to this defendant in accordance with the judgment. The other reason is that, even if all the stock had been issued to the existing members of the corporation, the defendant would still be entitled to an apportionment and transfer to it of its proper share of the stock; and for that pur-

pose the present stockholders should surrender so much of the stock held by them as may be necessary. They received and hold the stock subject to this condition. The obvious and expressed purposes of the corporation are not to be frustrated by allowing the existing stockholders to take and to hold all the stock so as to exclude other corporations from participation. That would be opposed to the purposes for which the corporation has its existence.

Order and judgment affirmed.