## STATE v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.[1]

No. 27,959.

September 19, 1930.

[1]Reported in 232 N. W. 105, 233 N. W. 866.

*O'Brien, Horn & Stringer,* for appellant.

*Henry N. Benson,* Attorney General, and *William K. Montague,* Assistant Attorney General, for the state.

OLSEN, C.

Action by the state to collect a gross earnings tax upon certain items of alleged gross income of the defendant railway company.

There were three items in dispute: One of these is not now contested. The district court awarded judgment against the defendant for the tax, penalty and interest on all three items, and this appeal is from the judgment. The facts are stipulated and are not in dispute.

The first item in dispute is the tax upon $7,633.85 receipts from operation of the parcel checking room in the St. Paul union depot during the years 1920 to 1925, inclusive. The St. Paul Union Depot Company is a corporation organized under the laws of this state. Its capital stock of $1,000,000 is owned in equal shares by the nine railway companies entering the city and using the depot. The depot company holds title to the union depot and leases it to the nine railway companies. By contract with the railway companies, the depot company operates the depot for their use and

benefit, the expense being shared by the nine railway companies on a basis of traffic, which we need not particularize. The income from the parcel checking room and other concessions in and about the depot is received by the depot company and used by it toward defraying the expenses of operation, thereby reducing to that extent the amount of money the railroad companies would have to pay. The income coming to the depot company from concessions and charges earned in operation of the depot does not at any time cover the expenses, and each year the railway companies pay additional sums, as by contract provided, to the depot company, to defray the expense of operation and other fixed charges. The depot company makes no profit. It is stipulated that the parcel checking room in question was maintained for the convenience of the public traveling upon the railroads using the depot. The $7,633.85 here taxed was the share of the parcel room receipts which went to the benefit and credit of this defendant. The actual money received was used by the depot company in defraying its expenses and fixed charges and was not actually paid over in money to this defendant.

That there may be incidental income from the operation of the depot, which is so disconnected from the transportation business as not to be gross income from that business and not subject to the gross earnings tax, may be conceded. But in the situation here outlined and as more fully shown by the stipulation and contracts in evidence, the depot company is a mere agency of the railway companies in operating the depot facilities in this city for the use and convenience of their transportation business. Income earned by the depot company for the benefit of the railway companies, which is so connected with and for the benefit of the transportation business of the railways as to be a part of such business, is, for all practical purposes, gross income of the railways in their transportation business.

The state sought at one time to impose a gross earnings tax upon the gross earnings of the St. Paul Union Depot Company. The matter came before this court in State v. St. Paul Union Depot Co. 42 Minn. 142, 43 N. W. 840, 841, 6 L. R. A. 234. What was there decided seems to determine this case. After setting forth the gen-

eral and special acts under which the depot company operates, the court said [42 Minn. 143]:

"It is evident that this act [Sp. Laws 1879, c. 318] contemplated that the entire stock of defendant should be owned by and equitably apportioned among the various roads desiring to use its terminal facilities, for it is not to be supposed that the legislature intended that such railway companies should have the exclusive management of the corporate property and business while the stock should be owned by some one else. It is also apparent that it was never intended or contemplated that defendant should do what may be termed a 'separate and independent railroad business of its own,' but that it was merely designed as an agency through which there might be furnished, for the common benefit and use of all railroads coming into the city, a union depot and terminal facilities, to better enable them to perform their duties as common carriers in receiving, delivering, and transferring passengers and freight in this city. * * *

"We cannot see what difference it can make whether they hold the depot property as tenants in common, or put it in the name of a trustee to hold and manage for their common use, or, as in this case, organize a corporation for the same purpose, as a more economical and convenient method of holding the property, managing the business and apportioning the expenses among themselves."

Because the depot company was but an agency of the railroads and the railway companies had paid the gross earnings tax upon all their earnings, it was accordingly held that the depot company was not subject to a gross earnings tax. The question of the liability of the railway companies to pay the tax upon items of income such as parcel room receipts was not considered in that case. A brief analysis of the situation and decision leads to the conclusion that the railway companies are so liable. The gross earnings tax is intended to reach and apply to all gross income from railroad transportation business, in lieu of a direct tax on the property employed in that business. The depot company is concededly engaged in the

railroad transportation business. It does not pay a gross earnings tax because it is a mere agency of the railroads. It does not pay the tax because its income is the income of the railway companies upon which they must pay the tax. The operation of a parcel checking room is quite clearly in aid of and a part of the transportation business of these railways, and income therefrom is part of and taxable as gross income of that business. The court correctly ruled that defendant was liable for the tax on this item.

■ The second item in dispute is on the so-called Pullman excess receipts. The Pullman Company owns and services the Pullman cars used on defendant's railway. The railway company collects from passengers riding in the Pullman cars the regular passenger fare and, in addition thereto, a surcharge equal to one-half of the sleeping car fare charged by the Pullman Company. In addition to that, by contract between them, it is provided that the Pullman Company shall pay to the railway company all gross earnings of the cars furnished by it in excess of an average of $7,250 per car per annum up to $8,750; and, should said gross earnings exceed an average of $8,750, the Pullman Company shall also pay to the railway company one-half of the excess over $8,750 per car per annum. During the years 1923, 1924 and 1925, the Pullman Company paid to the defendant company $35,345.96 as excess earnings of its cars transported by defendant. The state seeks to collect, and the trial court gave judgment in its favor for, the gross earnings tax, interest and penalty on this item.

The Pullman Company reported to the state the entire gross earnings received by it from the operation of its cars on defendant's railway each year, including the excess income which it thereafter paid to defendant, and paid the gross earnings tax thereon under the law imposing a gross earnings tax on sleeping car companies. G. S. 1923 (1 Mason, 1927) §§ 2277-2281. The law imposing the gross earnings tax on railroad companies is G. S. 1923 (1 Mason, 1927) §§ 2246-2255. The rate of taxation is the same, five per cent in each case. The manner of reporting gross earnings, levying and collecting the tax is substantially the same. The two laws are practically the same. One supplements the other. For present purposes no

distinction need be made here because one tax is under the one act and the other under the later act.

In the contract between the Pullman Company and this defendant it is provided that the Pullman Company shall repay to the railroad company any taxes against the Pullman Company, or in respect to the cars operated under this contract, or in respect to the ownership, use or operation thereof, which may have been paid by the railroad company.

The defendant contends here that now to permit the state to collect from the railway company a gross earnings tax upon this item of Pullman excess receipts, after the Pullman Company has already paid a gross earnings tax thereon to the state, will result in double taxation. The state urges several grounds upon which it claims double taxation does not result, and also that, even if in a sense that is true, it does not invalidate the tax. It is suggested that this gross earnings tax is not the same tax paid by the Pullman Company, because it is claimed under a different act of the legislature. What has already been said about the similarity of the two laws sufficiently disposes of that contention.

It is urged that the excess receipts paid by the Pullman Company to defendant should be held to be payments by the Pullman Company for services rendered by the railroad company in hauling the sleeping cars over its lines, or else as additional transportation charges collected by the Pullman Company as agent for the railroad company. Technically, it might be so held. But the gross earnings tax is a property tax measured by the gross earnings of the property, and the state does not intend to collect more than one such tax for the same purpose in the same year upon one item or class of property. When the railroad company paid the gross earnings tax upon all its gross earnings, except these earnings of the Pullman cars, and the Pullman Company paid the gross earnings tax upon all its earnings, including that part of the earnings thereafter paid to the railroad company, the state then had received full payment of taxes for the period covered, upon all the property, both of the railroad company and the Pullman Company, subject to taxation in this state.

It is said that even if the Pullman Company paid the tax it was not obliged to do so, acted as a mere volunteer, did not intend to or in fact pay any taxes for or upon the property of the railroad company, and that this money was earnings of the railroad company and taxable to it only. The state does not seriously contend that it should collect from both companies on this same item, but does urge that it should collect from the railroad company, and that the payment by the Pullman Company is no defense and should be disregarded. It is said that if an ad valorem tax on a piece of property, a tract of land for example, is paid, "it matters not who paid it—the tax is discharged," but that a different rule applies as to a lien tax. The difference, if any, is not apparent. The Pullman Company and the railroad company, while not partners, are jointly interested in the operation of the Pullman cars and in the receipts therefrom. A payment of the gross earnings tax on the gross receipts from such operation, by either party, would not seem to be the act of a mere volunteer but of one having an interest in the subject matter taxed. Again, while the Pullman Company is not a party to this suit and not bound by any judgment herein, yet the written contract between that company and the railroad company is properly in evidence before us, and we have the undoubted power to construe that contract here so far as it affects the rights of the parties now before the court. The earnings here in question were primarily earnings of the Pullman Company in the operation of its cars. By its contract with defendant it agreed to repay any tax paid by defendant in respect to the ownership, use or operation of these cars. It may be that the Pullman Company may have some reasons to urge why it is not obligated to pay the tax upon that part of the earnings of these cars which it has agreed to pay to defendant. But, so far as the taxes already voluntarily paid by it are concerned, the state has clearly been paid, and we see no theory upon which the Pullman Company could ever exact repayment.

The case of State v. St. P. M. & M. Ry. Co. 30 Minn. 311, 15 N. W. 307, has some application here. In that case the Northern Pacific Railway Company leased from the defendant the right to run its

trains over defendant's track and paid the defendant $40,000 per annum for such right. The Northern Pacific Company paid the gross earnings tax upon all its gross receipts, which included earnings by it from operating trains over defendant's line. The issue was whether the state could collect a gross earnings tax from the defendant on the $40,000 rent received by it from the Northern Pacific Company. It was held that this would be in the nature of double taxation or of exacting twice the commutation tax on the same property.

In State v. Minnesota & Int'l Ry. Co. 106 Minn. 176, 118 N. W. 679, 1007, 16 Ann. Cas. 426, the prior case is cited with approval. In the Minnesota & International Company case this appears [106 Minn. 182]:

"Twenty-six thousand dollars was received from the Brainerd & Northern Company and from the Northern Pacific Company for work train service in construction work for those companies. If payment of the three per centum upon the amount so received would result in double taxation, then these items should not be included; but it appears from the exhibits that the amount so received was not included in the gross earnings of those companies."

In State v. N. P. Ry. Co. 130 Minn. 377, 153 N. W. 850, the prior cases are reviewed. It is there held that, where defendant handled freight for other railway companies in and through its freight depots at Minneapolis and Duluth, at cost and without profit to defendant, payments made by such other companies to defendant to reimburse it for the expense incurred in so handling the freight should not be taxed as gross earnings against defendant. The other companies had properly reported all their gross earnings, which included their freight charges for transporting and handling the freight through defendant's freight depots, and had paid the gross earnings tax thereon, and again to tax the defendant on the money paid to it in repayment of expenses in handling the freight would result in double taxation.

The conclusions reached are that the Pullman Company, irrespective of any contract with defendant, properly paid the gross earn-

ings tax upon all receipts collected by it in the operation of its cars; that the gross earnings tax upon the item here in question has once been properly paid, and that now to exact a second payment would result in double taxation, which is not permissible under our laws and the decisions of this court. We have not overlooked the decisions cited from a few other jurisdictions where double taxation in matters of this kind has been permitted, but deem the rule well established in this state to the contrary.

The judgment appealed from is reversed so far as it permits recovery of the sum of $1,767.28 as tax upon the so-called Pullman excess receipts and the penalty and interest thereon; and upon the going down of the remittitur herein the trial court is directed to cause its judgment to be amended so as to exclude therefrom the said sum of $1,767.28 and the penalties and interest thereon.

AFTER REARGUMENT.

On December 26, 1930, the following opinion was filed:

PER CURIAM.

Reargument was granted on the question whether interest and penalty should be allowed as to the tax on the two items of income on which recovery was sustained.

The income in question accrued in the years 1920 to 1925, inclusive. G. S. 1923 (1 Mason, 1927) § 2246, enacted in 1912 but amended in 1919 and ratified at the general election in 1920, provides for the five per cent tax on the gross earnings of railroad companies. The section further requires each railroad company to make semi-annual reports of its gross earnings, on February 15 and August 15 each year, and provides that the tax thereon shall become due and payable September 1 and March 1 next after such reports. Where items of earnings are not reported, there is therefore not only a default in making report but also a default in payment on the dates when payment should have been made. Under G. S. 1923 (1 Mason, 1927) §§ 2235 and 2240, the state was authorized to charge and collect the penalty and interest from the time payment should have been made.

In State v. G. N. Ry. Co. 160 Minn. 515, 527, 200 N. W. 834, 839, the omitted earnings accrued prior to the adoption of the sections noted, and the decision was based on the holding that "there was no opportunity to pay the amount due without paying the excessive amount claimed." In our present case there was not only the opportunity but the statutory duty on the part of the railroad company to report and pay the tax. Even after the draft was presented, the company could, under G. S. 1923 (1 Mason, 1927) § 95, make payment of any part or item of such draft.

In County of Redwood v. Winona & St. P. Land Co. 40 Minn. 512, 41 N. W. 465, 42 N. W. 473, recovery was sought of taxes on land omitted from assessments. As there had been no assessment or levy of taxes against the land up to the time the proceedings were commenced, the court held there was no default up to that time and penalties and interest for prior years could not be collected. There the duty of assessing and levying the taxes rested upon the county officials, and there was no opportunity to pay the tax until it was assessed. The court said that if the law had required the landowner to list the property for taxation and he had failed to do so, that would have constituted such default as would justify charging him with interest.

We find no ground for modifying the decision heretofore filed.