## FIRST TRUST CO. OF ST. PAUL v. COMMONWEALTH CO.

### No. 11092.

Circuit Court of Appeals, Eighth Circuit.
July 12, 1938.
Rehearing Denied Aug. 15, 1938.

---

28

Cyrus A. Field, of Fergus Falls, Minn., and Melvin T. Woods, of Sioux Falls, S. D. (N. F. Field, of Fergus Falls, Minn., and Theodore M. Bailey, John H. Voorhees, and Roswell Bottum, all of Sioux Falls, S. D., on the brief), for appellant.

E. B. Harkin, of Aberdeen, S. D. (Harold King, of Britton, S. D., on the brief), for appellee.

Before STONE, WOODROUGH, and BOOTH, Circuit Judges.

WOODROUGH, Circuit Judge.

This suit in equity was brought by the trustee under a trust indenture securing $80,000 of bonds by mortgage upon the electric utility properties of the Commonwealth Company, a South Dakota corporation, serving the municipality of Britton, South Dakota. It was alleged that the defendant had defaulted in the performance of the conditions of article III of the trust indenture; that said default had continued for a period of in excess of sixty days prior to the commencement of the action, and that the trustee had on that account declared the whole of the principal and accrued interest of all the bonds due and payable, and appointment of receiver and foreclosure were prayed for. The defendant denied the alleged default and the trial court found in its favor and dismissed the case. The plaintiff has appealed.

The provisions of article III of the trust indenture are as follows:
"Fund for Maintenance and/or Extensions.

"The Company covenants that it will pay to the Trustee during the month of April in each of the years, 1931, 1932 and 1933 a sum equal to five per cent (5%) of the gross income derived from the sale by the Company of electrical energy during the twelve (12) months' period ending on the 31st day of March immediately preceding such payment, and during the month of April in each of the years commencing with the year 1934 and continuing so long as any bonds shall be outstanding hereunder the Company covenants to pay to the Trustee a sum equal to twelve and a half per cent

(12½%) of its said gross income for the twelve (12) months' period ending on the 31st day of March immediately preceding such payment. Such payment shall be held by the trustee in a separate fund hereinafter called "Maintenance and/or Extension Fund", and shall be held by the Trustee as further security hereunder, but so long as the Company is not in default hereunder shall, under the supervision of the Trustee and subject to its approval, be released to the Company from time to time in the manner hereinafter set forth in payment and/or reimbursement to it of costs of maintenance and/or extensions of the properties of the Company upon which this Indenture shall then be a first lien.

"In the event of a controversy as to the exclusion or inclusion of any item of expense for such maintenance and/or extensions, the said Trustee shall have the sole right to determine whether or not any such disputed item is properly included as an item of maintenance and/or extension. Any and all moneys paid out from said fund for maintenance and/or extensions shall be paid by the Trustee after the said maintenance and/or extensions have been completed upon proper bills and vouchers furnished by the Company to the Trustee for the work, labor and materials required for such maintenance and/or extensions; said bills and vouchers to be of a nature and character satisfactory to the Trustee. Payments by the Trustee from such fund and for such purposes shall be made direct to the creditors of the Company as evidenced by said bills and vouchers excepting in the case of expenses for labor and expenses for small items, both of which expenses for labor and small items not to exceed in the aggregate the sum of One Hundred Dollars ($100) in any one month, the Trustee shall reimburse the Company direct upon submission to it of receipted bills and vouchers for said expenditures.

"The Company may, in the judgment and discretion of its directors, take down and remove any portion or portions of the two distribution systems which duplicate each other, in said City of Britton, conveyed by this trust indenture, and retain the materials so derived, accounting for the same to the trustee by inventory from time to time, using the same for future maintenance and/or extensions, or may sell the same, or any part thereof, with the approval of the trustee. Any and all proceeds from the sales of any portion of such ma-

terial and equipment, however, shall be forthwith deposited with the trustee and by it placed in the fund provided for in this Article.

"If, in the judgment of the Company, a sum is accumulated in the fund created by this Article in excess of what is needed for such maintenance and/or extensions, it may, at its election, require the trustee to apply such sum as it may designate to the retirement of bonds."

It appears from the mortgage indenture that the Ottertail Power Company had contracted to sell and deliver the electrical energy to the defendant for distribution in the city of Britton, and it also appears from the record that the Ottertail Company was the owner of all the bonds secured by the trust indenture. The indenture provided that any breach on the part of defendant of any of the terms of the power contract during the time covered by the indenture while the Ottertail Company remains the owner of not less than fifty per cent. of the bonds secured shall constitute a default in the terms of the indenture. In effect the contract for furnishing the electric current was interwoven with and made a part of the trust indenture.

The gross amount of money actually received and taken in by the Commonwealth company derived from the sale by the company of electrical energy during the twelve months period ending on the 31st day of March, 1931, was the sum of $29,374.41. Article III required a payment in April, 1931, "equal to five per cent of the gross income derived from the sale by the company of electrical energy during the twelve month period ending on the 31st day of March, 1931," and five per cent. of $29,374.41 would be $1,468.72, which the trustee demanded. But the defendant company claimed the right to deduct the cost of its purchase of the part of the electric current which it had bought during the period and the sum of its expenses in generating the rest of the current from the gross amount of $29,374.41 received by it and to pay five per cent. on the remainder only. It computed such cost of purchasing and generating the electrical current to have been $13,315.81 during the period and it claimed its payment to the maintenance fund should have been $802.93. It paid the excess $665.79 to make up the total sum of $1,468.72 to the trustee under protest.

The same dispute concerning the amount payable by defendant under Article

III of the trust indenture recurred during each of the years 1932, 1933, 1934 and 1935, and in each year the defendant paid to the trustee the stipulated percentage upon the gross amount of money actually received and taken in by the company derived from the sale by the company of electrical energy, but the excess over the amount computed as it claimed the right to compute it, was always paid under protest.

During the twelve month period following March 31, 1931, the Commonwealth Company duly made requests and requisitions of the trustee for disbursements by the trustee from the fund for maintenance and/or extensions from time to time, pursuant to and under the terms of Article III, and pursuant to such requests and requisitions the trustee made payments out of the fund during the period pursuant to the terms of Article III, aggregating $1,437.63; and the total balance left in the fund on March 31, 1932, was the sum of $38.27.

Similarly, in each of the following twelve month periods up to the period ending March 31, 1936, after the Commonwealth Company had made the payments required by the trustee it made similar requests and requisitions of the trustee to make disbursements out of the fund and the same were made, pursuant to the terms of Article III, so that the fund was practically exhausted each year and only a balance of $21.89 remained in it on March 31, 1936.

The defendant Commonwealth Company took the position that it had paid in to the trustee pursuant to Article III during the period from March 31, 1931, to March 31, 1936, much more than it was required to pay by the terms of the article properly construed, and that it was entitled to have the excess applied upon the April, 1936, payment called for under the article. The amount then payable under the trustee's calculation was $3,810.97, and the excess defendant had paid in, computed according to its method, was $4,846.06—more than enough to meet the April, 1936, payment on that basis of computation. Still more on the defendant's basis of computation. The defendant made no payment or tender to the trustee for the maintenance fund in the month of April, 1936, nor for more than sixty days thereafter, and the trustee, having made demands, claimed default and declared the whole mortgage debt due.

The position of the appellant trustee is that the words "gross income derived from the sale by the company of electrical energy" as used in the trust indenture, mean "that amount of money which comes in or is received" from such sale without deduction for cost of purchase or production of the electric energy, and that the use of the word "gross" in the clause of the article negatives any right to make deduction for costs or expenses before making the percentage computation. It also contends that the defendant defaulted, regardless of the proper construction of the disputed clause of the article, by reason of its failure to pay any sum into the maintenance and extension fund in April, 1936.

The research of counsel has developed an incredible amount of judicial exposition upon the meaning of the word "income" used in different relations in statutes and ordinances concerning taxes and excises, federal and state, and in wills and contracts, public and private. The mere citation of cases covers pages. In the litigious field of federal and state income taxation the word always carries the implication of gains, profits or increment. That mode of taxation is designed to reach gains distinguished from possessions. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. Sometimes the same implication must be ascribed to the word "income" in other fields of taxation. Lewellyn v. Pittsburgh, B. & L. E. R. Co., 3 Cir., 222 F. 177.; Doyle v. Mitchell Bros. Co., 247 U.S. 179, 38 S.Ct. 467, 62 L.Ed. 1054. But not always.

The word has often been used in relation to occupation and excise taxation and in wills and contracts, public and private, in a different sense. There are many situations and contexts in which the word is used to mean money that comes in without reference to any gain or profit, and the word "gross" used in connection may accentuate the exclusion of any thought of gain or profit in the matter. We quote from 31 C. J., p. 401, Section 6:

"Gross Income. A term whose construction and meaning depend upon the context and subject matter; the entire amount that the use of the principal yields; the total receipts from a business before deducting expenditures for any purpose. * * * It may be equivalent to 'gross proceeds' or 'gross receipts.' * * *."

In Mundy v. Van Hoose, 104 Ga. 292, 30 S.E. 783, the court said (page 786):

" * * * * 'Income' is defined to be 'that which comes in or is received from any

business or investment of capital, without reference to the outgoing expenditures.'

" '* * * but, strictly speaking, "income" means that which comes in or is received from any business, or investment of capital, without reference to the outgoing expenditures; while "profits" generally means the gain which is made upon any business or investment when both receipts and payments are taken into the account. "Income," when applied to the affairs of individuals, expresses the same idea that "revenue" does when applied to the affairs of a state or nation; and no one would think of denying that our government has any revenue because the expenditures for a given period may exceed the amount of receipts.' "

In People v. Board of Supervisors of Niagara County, 4 Hill, N.Y., 20, the court said:

"It is undoubtedly true that 'profits' and 'income' are sometimes used as synonymous terms; but, strictly speaking, 'income' means that which comes in, or is received from any business or investment of capital, without reference to the outgoing expenditures; while 'profits' generally mean the gain which is made upon any business or investment when both receipts and payments are taken into the account."

In Eaid v. National Casualty Co., 122 Or. 547, 259 P. 902, pages 905, 906, the court quotes Words and Phrases, First Series, page 3504, as follows:

" 'Income' means that which comes into or is received from any business or investment of capital, without reference to the outgoing expenditures. The term, when applied to the affairs of individuals, expresses the same idea that 'revenue' does when applied to the affairs of a nation.

"See Bates v. Porter, 74 Cal. 224, 15 P. 732; Anderson's Law Dictionary, p. 532. While the word 'income' is sometimes used synonymously with the word 'profits,' it is clearly apparent that in the application of plaintiff the word was used to denote the amount received by him in his occupation in order to approximate the loss which he would sustain by reason of being incapacitated from pursuing his usual vocation."

As to the significance of the word "gross" joined with "income", we quote from Webster's New International Dictionary, Second Edition, page 1258,

"Income. That gain or recurrent benefit (usually measured in money) which pro-ceeds from labor, business, or property; commercial revenue or receipts of any kind. The total receipts from any branch of business are known as the gross income. That portion of the receipts which remains after paying wages and for materials is known as net income, which is in turn subdivided into interest on the capital invested and profits over and above this interest, or net income in the narrowest sense."

In Trefry v. Putnam, 227 Mass. 522, 116 N.E. 904, L.R.A.1917F, 806, the court said (page 907):

" 'Income,' like most other words, has different meanings dependent upon the connection in which it is used, and the result intended to be accomplished."

As far as the specific words "gross income" are concerned, the cited decision which on its facts is closest to the case at bar appears to be Columbia Railway Gas & Electric Co. v. Jones, 119 S.C. 480, 112 S.E. 267. The court there said (page 272):

"Gross income means the total receipts from a business before deducting expenditures for any purpose. Black's Law Dictionary; German Alliance Ins. Co. v. Van Cleave, 191 Ill. 410, 61 N.E. 94, 96."

We conclude that the term "gross income" cannot be said to convey the same definite and inflexible significance under all circumstances and wherever used. Its meaning depends on the connection in which it is used and the result intended to be accomplished. Here we must ascribe that meaning which conforms the contract to the intent of the parties.

The prime purpose of the parties apparent upon consideration of Article III was to provide a fund to be held by the trustee as further security for the mortgage debt. The fund was to be used by defendant for maintenance and betterments of its mortgaged property and was to be paid out only on the approval and under the supervision of the trustee. Any excess over requirements for such purposes could be applied to retirement of the bonds. The fund was to enhance the mortgagee's security by bettering the mortgagor's property and reducing its mortgage debt. The payments were not to the sole benefit of the bondholders, but the fund into which the payment went was of mutual advantage to both parties. The payments into the fund for the mutual benefit were not exactions analogous to taxes, and considerations which

have controlled many of the tax cases are entirely without application.

As the Ottertail Power Company was the owner of the bonds secured by the indenture, and was also furnishing the electric energy to be distributed by the defendant (most of it at first and all of it later), it is fair to consider the words of the contract with that relationship of the parties towards each other in mind. It seems more probable that the parties would look upon the total proceeds of the sale of Ottertail electric energy as gross income to the defendant. The Ottertail Company was the one which was generating and supplying the current that was to produce the income, but instead of going to the Ottertail Company as income to that company the proceeds were to be paid to and become the income of the defendant by virtue of the power contract. The parties would hardly look upon the part of the proceeds which would be left after the share contracted to be paid to the Ottertail Company was taken out as the gross income to the distributing company derived from sales. The use of the word "gross" in "gross income" as the base upon which the percentage was to be reckoned for payment into the maintenance fund carries a strong implication against any deductions and suggests that the whole amount coming in from sale was what was intended, and the contract relations of the parties strengthens the conclusion. A common definition of "gross" is "without deduction." Fire Association of Philadelphia v. Love, 101 Tex. 376, 108 S.W. 158, 810, at page 160; "The word 'gross' is defined: 'Whole; entire; total; without deduction.' Webster's Dictionary; Scott v. Hartley, 126 Ind. [239] 246, 25 N.E. 826."

In Pacific Gas & Electric Co. v. Roberts, 176 Cal. 183, 167 P. 845, the following appears (page 848):

"In the illuminating discussion of this subject [income] the court cited German Alliance Ins. Co. v. Van Cleave, 191 Ill. 410, 61 N.E. 94, wherein 'gross income' was held to be the gross receipts of the business, the court saying that the word 'gross,' as used in the statute, is opposed to 'net,' and in its ordinary signification is applied to all of the receipts of the business, while net receipts are those remaining after deductions for the expenses of conducting the business."

See People v. Board of Supervisors of Niagara County, 4 Hill, N.Y., 20; New York Rapid Transit Corporation v. New York, 58 S.Ct. 721, 82 L.Ed. 1024; German Alliance Insurance Co. v. Van Cleave, 191 Ill. 410, 61 N.E. 94; State v. St. Paul, Minneapolis & Manitoba Ry. Co., 30 Minn. 311, 15 N.W. 307; State v. Northern Pacific R. Co., 32 Minn. 294, 20 N.W. 234; State v. Minnesota & International R. Co., 106 Minn. 176, 118 N.W. 697, 1007, 16 Ann.Cas. 426; State v. Northwestern Telephone Exchange Company, 107 Minn. 390, 120 N.W. 534; State v. Minneapolis & St. Paul S. R. Co., 122 Minn. 106, 142 N.W. 19; State v. Chicago, R. I. & P. R. Co., 181 Minn. 615, 232 N.W. 105, 233 N.W. 866.

The defendant has contended that to take its total receipts from sales as the base on which to compute its payments to the maintenance fund diverts its capital into the fund, and in the course of its argument the electric energy of the company is likened to the capital investment of a merchant in his stock of goods. It is argued that if the computation is on the gross receipts from sale: "In the course of a short period of years the capital of the company would be depleted." "The more business it did the sooner the end would come." It must be conceded that if the construction of gross income urged by plaintiff would work out in that way it might be found to conflict with the intent of the parties.

But in the business of the utility the electric energy generated and simultaneously consumed was not part of the capital structure of the utility in any wise comparable to a merchant's investment in his stock of goods. In each of the five years during which payments were made into the maintenance fund, the combined expenditures for purchased current and for current generated by the defendant never reached one-half of the receipts, in fact, rarely exceeded two-fifths thereof. In the purchase of current the defendant company did no more than to assume liability for payment. The Ottertail Company really received its compensation out of the receipts from the consumers, and such course of the business was doubtless within the contemplation of the parties when the indenture was made. To treat all the proceeds which come in to the defendant from the sale of the current as gross income derived from the sale and to figure the payments to the maintenance fund on that amount without deduction does not cause the payments to become expenditures out of invested capital. It conforms the payments to the true intent of the parties.

Bearing in mind that the Ottertail Company was not only the creditor of the defendant secured by the trust indenture, but was supplying the defendant with its electric current, it seems more probable that its intention was to say to defendant, in effect, "You must apply a percentage of all you take in from current to keeping up your plant," and that defendant so understood. That would be consonant with the business in hand. It is unlikely the parties intended that the payments into the maintenance fund should fluctuate uncertainly from year to year, depending upon the amounts paid out by defendant for oil, supplies, labor, insurance, workmen's compensation, depreciation, taxes, etc., which defendant now claims the right to deduct before computing the payments for maintenance.

We think the defendant paid in the correct amounts of money required by Article III each year up to April, 1936, and no more.

But we are also persuaded that there was default even upon the defendant's construction of the contested words of the contract. Although the defendant protested against making the payments in the amounts called for by the trustee, such payments were voluntary in law. 21 R.C.L. Sec. 173; Michel Brewing Co. v. State, 19 S.D. 302, 103 N.W. 40, 70 L.R.A. 911; Cook v. Boston, 91 Mass. 393, 9 Allen 393; Shoemaker & Co. v. Board of Health of Gloucester, 83 N.J.L. 425, 85 A. 312; McMillan v. Richards, 9 Cal. 365, 70 Am.Dec. 655. The payments made were applied to maintenance and extensions and the defendant can not later require a different application. Section 757, subsection 1, South Dakota Revised Code, 1919; 48 C.J. Section 92, p. 647; Cardinell v. O'Dowd, 43 Cal. 586. The stipulated facts and undisputed testimony show that all the moneys paid by defendant on account of the maintenance and extension fund, with the exception of $21.89, were expended upon orders submitted by defendant or have been otherwise paid out and applied at the direction of the defendant. In April, 1936, there was practically no money left in the fund and the defendant was required by the express terms of the inden-

ture to make the annual payment at that time. Even if the defendant had overpaid the trustee in prior years and had caused more money to be spent on maintenance and extension of its property than the contract obliged it to provide for maintenance or extension, it would not on that account have the right to thereafter cease and desist making maintenance payments called for by the indenture. It could not refuse to continue to provide for maintenance of the distribution plant on account of what had gone before.

Defendant contends that the trustee had the sole right to determine what expenditures should be made from the maintenance fund and when said expenditures should be made, and concludes that the expenditures which were made before April, 1936, should be deemed to have been made by the trustee alone. But such conclusion conflicts with the stipulation that the defendant "made requests and requisitions of the trustee for disbursements" and that the payments aggregating practically the total amounts paid in were paid out "pursuant to such requests and requisitions." Although the contract prevented the defendant from disbursing the maintenance and extension fund without the consent of the trustee, the fund was for the mutual benefit of both and so were the expenditures made out of it. Having requisitioned and requested the expenditure of the money upon its property so as to exhaust the fund, the defendant may not assert that there was money in the fund to meet the payment it was obligated to make in April, 1936.

This conclusion is also fortified by the relation of the parties. It would be an unreasonable interpretation of the contract to hold that the defendant was not obliged to provide for the upkeep of its property during 1936 and later years although the Ottertail Company was obligated to keep up the supply of current for the period. The necessity for maintenance recurred each year of continued operations, no matter what may have been done in prior years.

Reversed, with directions to proceed to foreclose.